205 P.3d 594

**LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff–Appellant/Cross–Appellee,**

v.

**SENTINEL INSURANCE COMPANY, LTD. and Hartford Insurance Group, Defendant–Appellee/Cross–Appellee,**

**Zashell Labrador and PEMCO Mutual Insurance Company, Defendant–Counterclaimant/Appellee/Cross–Appellant,**

**Elisa Tolfree, et al., Defendants.**

**No. 27429.**

Intermediate Court of Appeals of Hawai'i.

March 31, 2009.

As Corrected June 16, 2009.

332

Thomas Tsuchiyama, (Sumida & Tsuchiyama), Honolulu, for Plaintiff–Appellant/Cross–Appellee.

Phillip L. Carey, Hilo, for Defendant-Counterclaimant/Appellee/Cross-Appellant.

RECKTENWALD, C.J., WATANABE, and FOLEY, JJ.

Partial Opinion of the Court by WATANABE, J., as to Parts I. through II.B.1; Partial Opinion of the Court by RECKTENWALD, C.J., as to Parts II.B.2. and III.; and WATANABE, J., dissenting as to Part II.B.2. and dissenting in part as to Part III.

Partial Opinion of the Court by WATANABE, J.

Plaintiff–Appellant/Cross–Appellee Liberty Mutual Insurance Company (Liberty Mutual) appeals and Defendant–Counterclaimant/Appellee/Cross–Appellant Zashell Labrador (Labrador) cross-appeals from the certified final judgment (Final Judgment) entered by the Circuit Court of the Third Circuit[1] (circuit court) on July 21, 2005. The Final Judgment determined that Liberty Mutual must pay Labrador $50,000 in underinsured motorist (UIM) benefits for injuries Labrador sustained as a passenger in a car driven by Defendant Elisa Tolfree (Tolfree) that allegedly veered off the road to avoid an unidentified truck pulling a trailer (phantom truck).

Tolfree's car was insured under two motor vehicle policies that provided liability and uninsured motorist (UM) coverage. Labrador was insured by her father's policy with Liberty Mutual, which provided stacked UM coverage totaling $140,000 and stacked UIM coverage totaling $140,000.

Following an arbitration between Labrador and Liberty Mutual, an arbitration panel determined that Labrador's damages amounted to $250,000 and that Tolfree was sixty percent at fault and the phantom truck's driver was forty percent at fault for the damages. Labrador reached settlements with Tolfree's insurers for liability and UM benefits and then sought UM and UIM benefits from Liberty Mutual.

Liberty Mutual contends that the circuit court erred when it: (1) held Liberty Mutual liable to Labrador for UIM benefits based on Tolfree's joint-and-several liability for all of Labrador's damages, (2) failed to credit Liberty Mutual with the amounts that Labrador received in UM benefits from Tolfree's insurers in determining that Labrador was underinsured, and (3) awarded attorney's fees to Labrador.

Labrador argues in her cross-appeal that the circuit court erred by failing to: (1) award her prejudgment interest; and (2) invalidate, as against public policy, the "other insurance" clause included in Liberty Mutual's policy.

1. Except as otherwise noted, the Honorable Greg K. Nakamura presided over all proceedings in the underlying action in the circuit court.

## I. BACKGROUND

On August 5, 1994, Labrador, who was then thirteen years old, was a passenger in a 1990 Subaru Legacy (car) driven by Tolfree when Tolfree veered her car off the roadway and into a utility pole (the accident), allegedly to avoid the phantom truck. Labrador was injured as a result of the accident, underwent four surgeries, and suffered permanent facial scars.

Tolfree's car was insured under a policy with PEMCO Mutual Insurance Company (PEMCO), a Washington state insurer,[2] which provided $100,000 in bodily-injury (BI) liability coverage and $100,000 in UIM coverage. Under PEMCO's policy, an "underinsured motor vehicle" was defined as "one to which no liability insurance policy or bond applies at the time of the accident" and therefore, included UM coverage. PEMCO's policy included the following "other insurance" clauses:

### PART II

### UNDERINSURED MOTORIST COVERAGES

. . . .

**Other Insurance**

If this policy and any other policy providing **[UIM]** coverage applies to the same loss, the maximum limit of liability under all policies will be the highest limit of liability that applies under any one policy. If other **[UIM]** coverage applies, we'll pay only our fair share of the loss. That share is our proportion of the total **[UIM]** insurance that applies to the loss. But any insurance we provide when **you** or a **covered person** use a vehicle you don't own will be excess over any other collectible insurance.

. . . .

### POLICY PROVISIONS

. . . .

**Other Insurance—Primary and Excess Insurance**

The insurance we provide for any **auto** described on the "Declarations" or for any replacement or additional **auto** we insure under this policy is *primary*. That is, it pays even if other insurance applies.

Any insurance provided by this policy for any **motor vehicle you** don't own is *excess*. That is, it protects **you** after the limit of primary insurance provided by another policy or loss-protection plan is exhausted or if there's no primary insurance or loss protection for that **motor vehicle**.

Sometimes, other primary insurance is available for a **motor vehicle** when our insurance also is primary. Or, other excess insurance is available for a **motor vehicle** when our insurance is excess. In either case, we'll pay only our fair share of any loss or damage. That share is our proportion of the total liability limit that applies to the loss. This definition of "our fair share" applies to all parts of this policy except "Parts II and III."

(Emphases in original.)

Tolfree's car was also insured under a policy issued by Hartford Insurance Group and Sentinel Insurance Company, Ltd. (H/S), which provided $100,000 in BI-liability coverage and $50,000 in UM coverage. The H/S policy included the following "other insurance" provision in both the UM and UIM sections of the policy:

If there is other applicable similar insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits.

However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.

(Formatting revised.)

Labrador was insured under her father's policy with Liberty Mutual covering four vehicles, which provided BI-liability coverage of $35,000 for each person, property-damage-liability coverage of $35,000 for each accident, stacked-UM coverage totaling $140,000, and stacked-UIM coverage totaling $140,000. Liberty Mutual's policy included the follow-

ing "other insurance" provision with respect to UM and UIM coverage:

If there is other applicable similar insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.

After the accident, Tolfree failed to disclose her H/S policy to Labrador and PEMCO. Tolfree also failed to tell H/S about the accident. Labrador entered into settlement negotiations with PEMCO, the only liability insurer she was aware of, and on October 30, 1996, her attorney notified Liberty Mutual of Labrador's intention to settle with PEMCO "for general damages only ... at [BI-liability] policy limits." Labrador's attorney also informed Liberty Mutual of Labrador's intention to pursue a UIM claim against Liberty Mutual:

If it is your or your principal's position that a settlement would jeopardize my client's claim, if any, to underinsurance, then we request that and your principal promptly notify us of its objection. In that instance we would ask your principal to advance a sum to our client equivalent to that offered by [Tolfree's] insurance company and he [sic] would assign to your principal any interest he [sic] may have to recover from [Tolfree] (but without giving up his [sic] claim to underinsurance).

This UIM letter should be construed as a claim for UIM benefits and as such for tolling the Statute of Limitations under the Hawaii No-fault Law.

We are taking the position that the settlement our client is receiving from [Tolfree's] insurance company is non-duplicative and reimbursement is not required under the statute. We will provide you with a copy of the release and declaration page.

Liberty Mutual neither objected nor consented to the settlement. On November 13, 1996, Labrador settled her claim with PEMCO for $100,000, the policy limit for BI liability, and executed a general release of all claims against Tolfree.

On August 27, 1997, Liberty Mutual informed Labrador of its discovery that Tolfree had an additional policy with H/S, which was apparently administered in Hawai'i by Pacific Insurance Company. Tolfree had purchased the additional coverage on August 2, 1994 upon her arrival in Hawai'i. Liberty Mutual advised Labrador that in light of Tolfree's overlapping policies with PEMCO and H/S, "we will be able to entertain [a UIM] claim only after the limits of liability under any applicable [BI-]liability bonds or policies have been exhausted by payment of judgments or settlements. Thus, we would suggest that you pursue a [BI] claim through Pacific Insurance at this time."

However, because Labrador had released Tolfree from all liability upon settling with PEMCO for the $100,000 BI limits, H/S refused to pay BI benefits to Labrador. H/S insisted that it was only obligated under its policy with Tolfree to contribute fifty percent to the settlement paid out by PEMCO.

By a letter dated March 15, 2000, Liberty Mutual rescinded its earlier offer to settle Labrador's UIM claim for $35,000[3] on grounds that Liberty Mutual: (1) was "entitled to a $200,000 offset (the total available amount of underlying [BI] limits), prior to exposing" the UIM policy; and (2) felt "that the value of [Labrador's] claim is under $200,000."

On September 6, 2000, Labrador filed a complaint in the circuit court against Tolfree in Civil No. 00-1-0361, seeking damages caused by Tolfree's negligence and misrepresentation/negligent misrepresentation of her insurance status.

By a letter dated April 24, 2001, Labrador demanded that Liberty Mutual pay her UM, "(instead of [UIM] coverage) under the policy[,]" on grounds that there were two tortfeasors involved in the accident—Tolfree and the unidentified driver of the phantom truck.[4]

---

3. It is not clear from the record on appeal when Liberty Mutual had made the earlier offer.

4. The record on appeal indicates that Liberty Mutual recorded Tolfree's statement about the accident in July 1997 but did not disclose the

Labrador attached a copy of a police report in which Tolfree had stated that the phantom truck caused the accident.

Sometime thereafter, Labrador, Liberty Mutual, and H/S agreed to a private arbitration of Labrador's *UM* claim, and the arbitration hearing was scheduled for November 28, 2001. Prior to the hearing, Labrador offered to settle with H/S and Liberty Mutual for three-fifths of their respective UM-policy limits. H/S agreed to the settlement and, on November 6, 2001, paid Labrador $30,000 of its $50,000 UM policy. In consideration of the settlement amount, Labrador released and discharged H/S from any and all claims for UM and UIM benefits under Tolfree's policy with H/S. On November 9, 2001, Liberty Mutual declined Labrador's settlement offer.[5]

On November 21, 2001, in Civil Case No. 01–1–0508, Liberty Mutual filed the underlying complaint against H/S, PEMCO, Labrador, Tolfree, and various John Doe defendants, seeking declaratory judgment and other relief to resolve the issues concerning priority of the multiple UM policies.

On November 28, 2001, the scheduled arbitration hearing was held between Labrador and Liberty Mutual. On December 20, 2001, a three-member arbitration panel issued an award for $250,000 in Labrador's favor and determined that Tolfree and the driver of the phantom truck were sixty and forty percent at fault, respectively, for Labrador's damages. Labrador then requested payment of UM benefits from Liberty Mutual pursuant to the arbitration award.

On January 23, 2002, in Civil Case No. 01–1–0508, Liberty Mutual filed a seven-count, first-amended complaint for declaratory judgment and other relief in the circuit court. In summary, the first-amended complaint sought a judgment declaring that:

- the arbitration award shall be reduced by $100,000, the amount of settlement proceeds paid to Labrador by PEMCO (Count 1);

- Liberty Mutual possesses a valid right of subrogation against Tolfree, H/S, and/or PEMCO, with respect to any UM insurance benefits paid or to be paid by Liberty Mutual to Labrador in connection with the accident (Count 2);

- Liberty Mutual is entitled to recover from Tolfree, Labrador, H/S, and PEMCO, jointly and severally, any UM benefits paid or to be paid by Liberty Mutual to Labrador in connection with the accident, and, in addition, is entitled to recover compensatory and/or consequential damages against Labrador for her and her attorney's conduct in impairing Liberty Mutual's subrogation rights (Count 3);

- Liberty Mutual's obligation, if any, to pay UM benefits is excess over and above the primary UM insurance limits available under H/S and PEMCO's policies and therefore, Labrador is required to obtain from H/S and PEMCO the UM limits available under their respective policies before Liberty Mutual is obligated to pay any UM amount (Counts 4 and 5);

- Liberty Mutual's obligation, if any, to pay UM benefits to Labrador shall be reduced by the $30,000 settlement amount with H/S and any other amounts in UM benefits received from H/S or PEMCO (Count 6); and

- Labrador is not entitled to UIM benefits from Liberty Mutual because (1) she waived and/or is estopped from asserting a UIM claim after representing that she would pursue a UM claim instead; (2) she is not legally entitled to recover damages from any underinsured motorist af-

---

statement to Labrador until Tolfree was about to be deposed in 2001. In her statement, Tolfree explained that just prior to the accident, which occurred on a rainy day, she was driving on a straight thoroughfare approaching a curve in the road when she saw a trailer truck which "someone told [her] it's like a papaya truck ... going around the curve." The truck, according to Tolfree, was "like straddling the line and ... had a trailer, an empty like flatbed[.]" Tolfree stated

that because she thought the truck was "going to run us off or hit us," she "put on the brakes," which "locked because of the conditions[,]" causing Tolfree's car to cross the line and collide with the utility pole on the edge of the curve.

5. Liberty Mutual's share, if it had accepted Labrador's offer, would have been $84,000.

ter having executed a full and unqualified release of claims against Tolfree without any reservation; (3) Liberty Mutual is entitled to a credit for all BI liability insurance applicable to Tolfree's vehicle at the time of the accident and the total amount of such insurance exceeds the amount of damages attributable to Tolfree as determined by the arbitration award; and/or (4) Liberty Mutual's UIM coverage, if any, is excess to the primary UIM coverages applicable to Tolfree's vehicle at the time of the accident and the amount of such primary UIM coverages exceeds the amount of damages attributable to Tolfree (Count 7).

On February 27, 2002, Labrador filed a motion for partial summary judgment (Labrador's 2/27/2002 motion for partial summary judgment) against Liberty Mutual as to all issues keeping Liberty Mutual or the other insurers from paying the confirmed arbitration award. Labrador asserted that, based on the arbitration award, she was entitled to summary judgment because: (1) Liberty Mutual, as the only UIM carrier with no BI-liability coverage on Tolfree's car, was liable for UIM benefits of $50,000; (2) Tolfree was jointly and severally liable for all of Labrador's damages and was therefore underinsured; (3) Labrador's damages exceeded the available BI-liability coverage of $200,000, making Tolfree underinsured for $50,000; (4) Labrador did not waive her UIM claim by sending Liberty Mutual the April 24, 2001 letter demanding payment of UM benefits, instead of UIM benefits; (5) "Liberty Mutual has no right to withhold or delay payment of UM or UIM proceeds based on alleged subrogation rights"; and (6) Liberty Mutual's "other insurance" clause is invalid but, even if valid, should not delay payment by Liberty Mutual, who can pursue the other insurers.

On March 7, 2002, in Special Proceeding Case No. 01–1–0047, the circuit court[6] entered an order granting Labrador's motion to confirm the arbitration award "to the extent that it relates to the issues of liability and damages recoverable against the [UM] as set forth in [the arbitration award]" but denied

Labrador's motion "to the extent that it requests attorneys' fees, costs and/or post-judgment interest[.]" The circuit court also stayed execution of the arbitration award while the declaratory judgment action was pending. After the arbitration award was issued, Labrador settled her UM claim against the PEMCO policy for $60,000, and PEMCO then assigned to Labrador its right to any UM claim against Liberty Mutual.

On March 8, 2002, Liberty Mutual filed a cross-motion for summary judgment against Labrador, seeking a declaration that: (1) Labrador is not entitled to UIM benefits from Liberty Mutual in connection with the accident; (2) Liberty Mutual may recover from Labrador any UM benefits paid or to be paid to Labrador by Liberty Mutual in connection with the accident, plus compensatory and/or consequential damages arising from the conduct of Labrador and her attorneys in impairing Liberty Mutual's subrogation interests; (3) any obligation by Liberty Mutual to pay UM benefits is excess over primary UM benefits available under H/S's and PEMCO's policies and, therefore, Labrador is required to obtain $50,000 and $100,000 in UM benefits, respectively, from H/S and PEMCO before Liberty Mutual is obligated to pay any UM amounts; and (4) any obligation by Liberty Mutual to pay UM benefits to Labrador shall be reduced by $30,000 and/or any UM amounts received from H/S and/or PEMCO.

On March 20, 2002, H/S filed a joinder in Labrador's 2/27/2002 motion for partial summary judgment. H/S argued that Liberty Mutual's subrogation rights, if any, against H/S were barred by Labrador's release and discharge of Tolfree and Labrador's settlement with H/S of her UM and UIM claims.

On April 11, 2002, PEMCO filed its answer to Liberty Mutual's first amended complaint, counterclaim against Liberty Mutual, and cross-claim against H/S. In its counterclaim, PEMCO alleged, in relevant part, as follows:

 4. [UM] coverage is considered to be coverage personal to its insured which follows the insured's person.

 5. That portion of the OTHER INSURANCE provision of [Liberty Mutual]

---

**6.** The Honorable Ronald Ibarra entered the order.

UM coverage in the above-referenced policy states that "however, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance" is void as against Hawaii's public policy governing UM coverage or is otherwise unenforceable.

6. Said OTHER INSURANCE provision of [Liberty Mutual's] UM coverage in the above-referenced policy states that "if there is other applicable similar insurance, we will pay only our share of the loss. Our share is the proportion that our limit of liability leave to the total of all applicable limits."

7. [Labrador] is entitled to collect from [Liberty Mutual] the amount determined by the UM arbitration between [Labrador] and [Liberty Mutual] to be the damages [Labrador] suffered as a result of an uninsured motorist ($100,000) subject to an offset of any [UM] coverage already received ($30,000) or otherwise available ($50,000) and subject to its right to recover a portion of the remaining amount from the other carriers providing [UM] coverage to [Labrador] for damages she suffered from the subject accident.

8. [Liberty Mutual] is responsible for $140,000 ( [Liberty Mutual's] UM coverage amount) over $290,000 (the total of all the carrier's [sic] UM coverage) up to the limits of its policy of any properly determined value of any UM claim made by [Labrador] arising out of the subject accident.

9. [PEMCO] is not bound by the outcome of the UM arbitration between [Labrador] and [Liberty Mutual].

(Brackets omitted.)

In its cross-claim against H/S, PEMCO alleged that it was entitled to an award of fifty percent of the payments it had made to or on behalf of Tolfree and Labrador as a result of the accident, plus attorney's fees and costs.

On April 18, 2002, PEMCO filed its memorandum regarding Labrador's 2/27/2002 motion for partial summary judgment. PEMCO noted that its policy with Tolfree was issued in the State of Washington by a Washington insurer to cover a car that was then in Washington. Therefore, PEMCO stated, Washington insurance laws define the rights of PEMCO and any person claiming UIM benefits under PEMCO's policy. PEMCO observed that pursuant to PEMCO's UIM policy, as well as the Washington case of *Millers Casualty Insurance Co. of Texas v. Briggs*, 100 Wash.2d 1, 665 P.2d 891 (1983), cited with approval by the Hawai'i Supreme Court in *Kang v. State Farm Mutual Automobile Insurance Co.*, 72 Haw. 251, 815 P.2d 1020 (1991), Labrador would not be able to collect both liability and UIM benefits under PEMCO's policy. Noting that Labrador had $140,000 in stacked-UIM coverage for four vehicles under her father's policy with Liberty Mutual, for which her family had paid premiums, PEMCO argued that there was ample UIM insurance for Labrador to fully recover her damages under Liberty Mutual's policy, subject to any credits allowed to Liberty Mutual pursuant to the Hawai'i Supreme Court's decision in *Taylor v. Government Employees Insurance Co.*, 90 Hawai'i 302, 978 P.2d 740 (1999). PEMCO further argued that there is no law in Hawai'i requiring that available UM coverage be exhausted before a claim for UIM coverage can be made, and because the Hawai'i Supreme Court has held that UM insurance provides personal coverage, Liberty Mutual should not be allowed to provide that its UM liability is excess to other collectible insurance.

On June 25, 2002, Labrador filed a cross-claim against PEMCO, alleging, in relevant part, that: (1) prior to May 25, 2001, Labrador's counsel had inquired of PEMCO as to UM coverage, but PEMCO denied UM coverage; (2) as a result, Labrador pursued a claim with Liberty Mutual, which had undisputed UM coverage; (3) Liberty Mutual then commenced arbitration, and although PEMCO was notified of the arbitration hearing, PEMCO did not submit to the arbitration process; (4) after obtaining the arbitration award, Liberty Mutual filed the instant declaratory action and obtained a court order to the effect that Liberty Mutual's coverage was not primary and, therefore, PEMCO's coverage was primary; (5) as a result, Liberty Mutual has refused payment of UM benefits; (6) PEMCO has failed to pay UM benefits, claiming that the arbitration award was

not binding on it and that Labrador must pursue yet another UM arbitration pursuant to PEMCO's policy provisions; (7) Labrador relied, to her detriment, on PEMCO's denial of coverage in proceeding against Liberty Mutual; (8) PEMCO's wrongful or mistaken denial of coverage constitutes a waiver of PEMCO's right to arbitrate, in another arbitration, the issue of damages caused by the uninsured driver of the phantom truck; (9) PEMCO is responsible for UM benefits up to an amount that will make Labrador whole pursuant to the arbitration award; and (10) PEMCO, because of its denial of coverage, is responsible for attorney's fees and costs incurred by Labrador. Labrador asked the circuit court to declare PEMCO responsible for UM benefits "of $100,000, constituting benefits awarded by the arbitrators ($250,-000) minus any amounts already paid ($130,-000), and taking into account policy limits of $100,000[,]" as well as attorney's fees, costs, prejudgment interest, and other appropriate relief.

On August 27, 2002, Labrador filed a motion to amend her answer to include an omitted counterclaim for bad faith against Liberty Mutual.[7]

On October 3, 2002, Liberty Mutual filed a motion for summary judgment against Labrador, seeking a judicial determination that Labrador was not entitled to UIM benefits from Liberty Mutual "[b]ecause joint and several liability does not apply to contractual UM and UIM claims, and because the $150,000 in damages attributable to [Tolfree's] negligence is less than her $200,000 liability limits[.]"

On October 3, 2002, Labrador filed a second motion for partial summary judgment against Liberty Mutual (Labrador's 10/3/2002 motion for partial summary judgment) on the limited issue of whether payment by Liberty

Mutual of $50,000 in UIM benefits would constitute double recovery by Labrador. Labrador argued that contrary to Liberty Mutual's claim, Liberty Mutual was not entitled to a credit for the total of UM settlements obtained ($90,000) and BI-liability coverage ($200,000).

On October 14, 2002, the circuit court entered an order granting Labrador's motion to amend her answer to include the counterclaim for bad faith. Labrador filed her first amended answer and counterclaim on October 24, 2002.

On October 30, 2002, Labrador filed a motion seeking an award of attorney's fees and costs against Liberty Mutual pursuant to Hawaii Revised Statutes (HRS) § 431:10–242 (2005).[8]

On December 4, 2002, the circuit court entered its findings of fact, conclusions of law, and order granting Labrador's 10/3/2002 motion for partial summary judgment and denying Liberty Mutual's October 3, 2002 motion for summary judgment (December 4, 2002 Order). In the December 4, 2002 Order, the circuit court entered six findings of fact regarding the insurance coverage applicable to Labrador's claim and the arbitration held to apportion liability between Tolfree and the driver of the phantom truck. The circuit court also entered the following conclusions of law:

1. It is undisputed that both UM coverage and UIM coverage are not available for the unidentified driver's vehicle. However, the analysis in this case requires determining the amount of damages payable to Labrador arising from the tort liability of the unidentified driver for the purpose of UM coverage and determining the amount of damages payable to Labrador arising from Tolfree's tort liability for

---

7. Labrador had apparently filed a bad-faith claim against Liberty Mutual on June 10, 2002, but the circuit court, the Honorable Riki May Amano presiding, dismissed the claim on grounds that it was a compulsory counter-claim to the declaratory judgment action.

8. HRS § 431:10–242 provides currently, as it did during all relevant proceedings below, as follows:

**Policyholder and other suits against insurer.** Where an insurer has contested its liability under a policy and is ordered by the courts to pay benefits under the policy, the policyholder, the beneficiary under a policy, or the person who has acquired the rights of the policyholder or beneficiary under the policy shall be awarded reasonable attorney's fees and the costs of suit, in addition to the benefits under the policy.

the purpose of UIM coverage. In other words, Labrador is not asking for both UM and UIM coverage arising from the operation of the same vehicle. Therefore Labrador is entitled to make both a claim for UM and UIM benefits under the Liberty Mutual policy.

2. There is no dispute that the applicable credit to be applied against the damages payable for Tolfree's tort liability for UIM coverage is $200,000. The credit is measured by the $100,000 liability coverage limits available under each of the PEMCO policy and [H/S] policy or [sic] a total of $200,000.

3. Under the terms of the Liberty Mutual policy[,]

> **Underinsured motor vehicle** means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but the amount paid for bodily injury under the bond or policy to an **insured** is not enough to pay the full amount the **insured** is legally entitled to recover as damages.

Under the HRS § 431:10C–103[,]

> "Underinsured motor vehicle" means a motor vehicle with respect to the ownership, maintenance, or use for which sum of the limits of all bodily injury liability insurance coverage and self-insurance applicable at the time of loss is less than the liability for damages imposed by law.

The question is what is the full amount Labrador is entitled to recover as damages from Tolfree or what is Tolfree's liability to Labrador for damages imposed by law.

One method of calculating the amount of damages payable by Tolfree would be to consider only the tort liability of Tolfree.

Another method of calculating damages would be to consider the tort liability of Tolfree and the unidentified driver. However, as this Court has previously ruled, the concept of joint and several liability applies as to Labrador's claim for damages against Tolfree and the unidentified driver. *Cf. Karasawa v. TIG Ins. Co.*, 88 Hawaii [Hawai'i] 77 [961 P.2d 1171] (App.1998). As such, based upon the arbitration award

and the stipulation of Liberty Mutual and Labrador that the arbitration award applies to Labrador's UIM claim against Liberty Mutual, Labrador is entitled to recover damages against [T]olfree in the amount of $250,000 and Tolfree's liability for damages imposed by law is $250,000.

4. Labrador agrees that the amount of the credit in calculating the UIM benefits payable by Liberty Mutual to Labrador is $200,000. Liberty Mutual agrees that if it receives this $200,000 credit, then it has no right of subrogation.

Therefore, the amount of UIM benefits payable by Liberty Mutual is calculated by reducing the Tolfree's [sic] liability for damages of $250,000 by the $200,000 credit. Based upon the foregoing, as a matter of law, Labrador is entitled to $50,000 in UIM benefits from Liberty Mutual.

5. It is possible to apply a similar analysis to the UM claim. Based upon this analysis, it may be argued that Labrador is entitled to UM benefits totaling $250,000. However, the concept of full but not duplicate recovery applies to limit Labrador's recovery. *AIG Hawaii Ins. Co. v. Rutledge*, 87 [Hawai'i] 337, 346, 955 P.2d 1069 (App.1998).

6. In this case, based upon the arbitration award, Labrador's full recovery of damages is $250,000. Based upon the amounts of insurance benefit paid and payable, Labrador's total recovery is $240,000, calculated as follows:

| | |
|---|---:|
| PEMCO liability coverage payment | 100,000 |
| [H/S] UM benefit payment | 30,000 |
| PEMCO UM benefit payment | 60,000 |
| Liberty Mutual UIM benefit payment | 50,000 |
| TOTAL | 240,000 |

Therefore, the UIM benefit payable by Liberty Mutual to Labrador does not result in a duplicate recovery.

In its December 4, 2002 Order, the circuit court also ordered:

> Furthermore, since Liberty Mutual has abandoned its other defenses to payment of UIM coverage, agreeing that waiver, release, and prejudice defenses are no longer an issue, there are no other declaratory judgment issues relating to payment

of the $50,000 UIM benefits. Therefore, [Labrador] is entitled to use this order to obtain a lifting of the stay of proceedings to confirm the arbitration award in S.P. No. 01–1–0047 as to her $50,000 UIM claim.

On March 17, 2003, the circuit court entered an order that denied Labrador's 2/27/2002 motion for partial summary judgment against Liberty Mutual and granted in part and denied in part Liberty Mutual's March 8, 2003 cross-motion for summary judgment. In denying Labrador's 2/27/2002 motion for partial summary judgment, the order stated, in relevant part, as follows:

Pursuant to the Motion, Labrador seeks a determination that Liberty Mutual has the obligation to pay her $50,000 in [UIM] benefits. Labrador argues that, pursuant to [a UIM] benefit arbitration, her damages total $250,000. The total amount of liability coverage available at the time of the accident was $200,000 for [Tolfree]. Therefore, Labrador asserts that she is entitled to $50,000 in UIM benefits from Liberty Mutual measured by the damages totaling $250,000 less the amount of liability coverage available at the time of the accident of $200,000.

Pursuant to the Arbitration Award in the UM benefit arbitration, Labrador may recover up to $100,000 in UM benefits arising from the liability of the unknown tortfeasor. Labrador has already received $100,000 in liability coverage benefits paid on behalf of Tolfree from [PEMCO]. Since Labrador is conceding that at most she is seeking a total of $250,000 in insurance benefits from all sources, she has a potential claim for UIM benefits in the amount of $50,000 from Liberty Mutual.

However, Tolfree had an additional liability insurance policy from [H/S] which provided $100,000 in coverage. Labrador did not receive any liability insurance benefits from [H/S]. Apparently, [H/S] has asserted that it has no obligation to pay liability insurance benefits to Labrador because Labrador released Tolfree under a release Labrador gave to Tolfree and PEMCO. Liberty Mutual has asserted that it has been prejudiced by the release

of Tolfree because it cannot exercise a right of subrogation against [H/S] if Liberty Mutual pays UIM benefits to Labrador. Labrador contends that Liberty Mutual impliedly consented to the settlement between herself and PEMCO.

Genuine issues of material fact exist at least as to the following: (1) whether Liberty Mutual consented to the settlement between Labrador and PEMCO, and (2) whether Liberty Mutual has been prejudiced as a result of the settlement with PEMCO, or more precisely, because of language of the release given by Labrador to Tolfree.

As to that part of Liberty Mutual's March 8, 2003 cross-motion for summary judgment that Liberty Mutual was not obligated to pay Labrador UIM benefits, the circuit court's order stated, in pertinent part:

Genuine issues of material fact exist as to whether Labrador waived her UIM claim by pursuing the UM claim.

. . . .

Liberty Mutual cites *Martin v. Illinois Farmers Insurance,* [318 Ill.App.3d 751, 252 Ill.Dec. 310] 742 N.E.2d 848 (Ill.App. 1 Dist.2000) for the proposition that since Labrador released Tolfree, Labrador is not entitled to recover damages from Tolfree. Further, since Labrador's entitlement to recover damages is a prerequisite to UIM coverage, such coverage is not available.

*Martin v. Illinois Farmers Insurance* does not stand for this proposition. The case stands for the proposition that a release can be so broadly drafted that it can be construed to encompass the release of a UIM claim. *Id.,* 742 N.E.2d at 855–56. In this case, the release states that it applies to "Elisa and John Tolfree and PEMCO Mutual Insurance." Therefore, there are at least genuine issues of material fact as to whether the release was intended to release a UIM claim against Liberty Mutual.

. . . .

Under the terms of the Liberty Mutual policy[,]

**Underinsured motor vehicle** means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident,

but the amount paid for bodily injury under the bond or policy to an **insured** is not enough to pay the full amount the insured is legally entitled to recover as damages.

Under the HRS § 431:10C–103[,] "Underinsured motor vehicle" means a motor vehicle with respect to the ownership, maintenance, or use for which sum of the limits of all bodily injury liability insurance coverage and self-insurance applicable at the time of loss is less than the liability for damages imposed by law.

The question is what is the full amount Labrador is entitled to recover as damages from Tolfree or what is Tolfree's liability to Labrador for damages.

Liberty Mutual argues, based upon the UM arbitration results, that Tolfree's liability to Labrador for damages is $150,000. This is based upon the Arbitrator's Award which places Labrador's damages at $250,000 and Tolfree's share of liability at 60%. Continuing on with its argument, Liberty Mutual then asserts that Tolfree had a total of $200,000 in liability coverage available. Since the liability coverage was greater than Tolfree's liability to Labrador for damages, Labrador is not entitled to UIM benefits from Liberty Mutual.

However, the doctrine of joint and several liability applies. Therefore, Tolfree is jointly and severally liable for the $250,000 in damages. More to the point, Tolfree is liable to Labrador for damages in the amount of $250,000 and Labrador is entitled to receive from Tolfree damages in the amount of $250,000.

As such, Liberty Mutual cannot escape payment of UIM benefits on the ground that Tolfree is severally liable for only $150,000 in damages payable to Labrador.

. . . .

Liberty Mutual contends that its right of subrogation has been prejudiced by Labrador's settlement with Tolfree. However[,] [t]here is now a significant body of judicial precedents for the proposition that in order to justify foreclosing an insured's right to indemnification from an otherwise applicable [UIM] coverage, an insurer must show that it was prejudiced by the settlement of the tort claim. Moreover, based on judicial precedents

in analogous situations involving the judicially imposed requirement, some courts will probably require an insured to show that the settlement resulted in substantial prejudice.

*A. Widiss, Uninsured and Underinsured Motorist Insurance, Rev. 2nd ed.* (1999), § 43.5.

Genuine issues of material fact exist as to whether Liberty Mutual's right of subrogation has been prejudiced by Labrador's settlement with Tolfree.

Regarding the part of Liberty Mutual's cross-motion that sought summary judgment that Liberty Mutual's UM policy was excess to H/S's UM policy, the circuit court concluded, after reviewing the "other insurance" provisions in Liberty Mutual's and H/S's respective policies, that H/S's policy "was primary in regard to UM benefits payable to Labrador and Liberty Mutual's policy provides excess coverage."

Also on March 17, 2003, the circuit court entered an order awarding Labrador $6,705 in attorney's fees but denying Labrador any prejudgment interest.

On November 30, 2004, the circuit court entered an order granting in part and denying in part Liberty Mutual's motion for leave to file an interlocutory appeal.

On July 21, 2005, the circuit court entered Final Judgment pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rules 54(b) (2000) and 58 (1990) in favor of Labrador and against Liberty Mutual, in accordance with the various orders discussed above. The Final Judgment determined that Liberty Mutual was obligated to pay Labrador $50,000 in UIM benefits and $6,705 in attorney's fees. Liberty Mutual filed its notice of appeal from the Final Judgment on August 1, 2005. Labrador filed her notice of cross-appeal on August 15, 2005.

## II. DISCUSSION

### A. *Liberty Mutual's Appeal*

1. *Whether Labrador's UIM Insurance Covered Tolfree's Joint–and–Several–Tort Liability for All Damages Incurred by Labrador*

Liberty Mutual contends that joint-and-several liability, as defined in HRS

§§ 663–10.9 (1993) [9] and 663–11 (1993), [10] is a tort concept which does not apply to contractual UM and UIM claims. Liberty Mutual points out that $150,000 in UM coverage was available under PEMCO's and H/S's policies to compensate Labrador for the forty-percent share of the damages ($100,000) caused by the uninsured driver of the phantom truck. Additionally, there was $200,000 in liability coverage available under PEMCO's and H/S's policies, an amount sufficient to cover Tolfree's sixty-percent share of the damages ($150,000). Therefore, Liberty Mutual argues, Tolfree was not "underinsured" and Labrador was not entitled to claim UIM benefits under her father's policy.

For the following reasons, we disagree with Liberty Mutual.

a.

■ Although claims against UM and UIM policies are contractual in nature, the policies must provide the coverage required by statute. *See Walton v. State Farm Mut. Auto. Ins. Co.*, 55 Haw. 326, 328, 518 P.2d

9. At the time the accident occurred, HRS § 663–10.9 provided, in relevant part, as follows:

**Abolition of joint and several liability; exceptions.**... *Joint and several liability for joint tortfeasors as defined in section 663–11 is abolished except in the following circumstances:*
(1) For the recovery of economic damages against joint tortfeasors in actions involving injury or death to persons.
(2) For the recovery of economic and noneconomic damages against joint tortfeasors in actions involving:
 (A) Intentional torts;
 (B) Torts relating to environmental pollution;
 (C) Toxic and asbestos-related torts;
 (D) Torts relating to aircraft accidents;
 (E) Strict and products liability torts; or
 (F) *Torts relating to motor vehicle accidents except as provided in paragraph (4).*
(3) For the recovery of noneconomic damages in actions, other than those enumerated in paragraph (2), involving injury or death to persons against those tortfeasors whose individual degree of negligence is found to be twenty-five per cent or more under section 663–31. Where a tortfeasor's degree of negligence is less than twenty-five per cent, then the amount recoverable against that tortfeasor for noneconomic damages shall be in direct proportion to the degree of negligence assigned.

1399, 1401 (1974) (holding that the insurance commissioner has "no authority to approve any policy provisions that are in contravention of any part of the Hawaii Insurance Law"); *Sol v. AIG Hawai'i Ins. Co.*, 76 Hawai'i 304, 307, 875 P.2d 921, 924 (1994) (holding that it was unnecessary to interpret vague and ambiguous terms of an insurance contract because to the extent that the contract terms conflicted with statutory language, "the statute must take precedence over the terms of the contract"); *Nat'l Union Fire Ins. Co. v. Ferreira*, 71 Haw. 341, 344, 790 P.2d 910, 912 (1990) (holding that "[i]nsurance policies are governed by statutory requirements in force and effect at the time such policies are written" and "[s]uch provisions are read into each policy issued thereunder, and become a part of the contract with full binding effect upon each party") (internal quotation marks omitted).

At the time the accident occurred, HRS § 431:10C–301(b) (1993) [11] provided, in relevant part, as follows:

(4) For recovery of noneconomic damages in motor vehicle accidents involving tort actions relating to the maintenance and design of highways including actions involving guardrails, utility poles, street and directional signs, and any other highway-related device upon a showing that the affected joint tortfeasor was given reasonable prior notice of a prior occurrence under similar circumstances to the occurrence upon which the tort claim is based. In actions in which the affected joint tortfeasor has not been shown to have had such reasonable prior notice, the recovery of noneconomic damages shall be as provided in paragraph (3).
(Emphases added.)

10. HRS § 663–11 provides:

**Joint tortfeasors defined.** For the purpose of this part the term "joint tortfeasors" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.

11. The language of HRS § 431:10C–301(b)(3) and (4) is essentially unchanged in the current codification of the statute, except that in the current subsection (b)(3), the word "however" is omitted after the word "provided," following the first semicolon.

**Required motor vehicle policy coverage. . . .**

(b) A motor vehicle insurance policy shall include:

. . . .

(3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage provided therein or supplemental thereto, in limits for bodily injury or death set forth in paragraph (1), under provisions filed with and approved by the commissioner, for the protection of persons insured thereunder who are *legally entitled to recover damages from owners or operators of uninsured motor vehicles* because of bodily injury, sickness, or disease, including death, resulting therefrom; provided, however, that the coverage required under this paragraph shall not be applicable where any named insured in the policy shall reject the coverage in writing; and

(4) Coverage for loss resulting from bodily injury or death suffered by any person *legally entitled to recover damages from owners or operators of underinsured motor vehicles.* An insurer may offer the underinsured motorist coverage required by this paragraph in the same manner as uninsured motorist coverage; provided that the offer of both shall:

(A) Be conspicuously displayed so as to be readily noticeable by the insured;

(B) Set forth the premium for the coverage adjacent to the offer in a manner that the premium is clearly identifiable with the offer and may be easily subtracted from the total premium to determine the premium payment due in the

event the insured elects not to purchase the option; and

(C) Provide for written rejection of the coverage by requiring the insured to affix the insured's signature in a location adjacent to or directly below the offer.

(Emphases added.) Additionally, HRS § 431:10C–103 (1993) defined the terms "[u]ninsured motor vehicle" [12] and "[u]nderinsured motor vehicle," [13] in relevant part, as follows:

**Definitions.** As used in [Article 10C relating to motor vehicle insurance]:

. . . .

(22) Underinsured motor vehicle means a motor vehicle with respect to the ownership, maintenance or use for which sum of the limits of all bodily injury liability insurance coverage and self-insurance applicable at the time of loss *is less than the liability for damages imposed by law.*

(23) Uninsured motor vehicle means any of the following:

(A) A motor vehicle for which there is no bodily injury liability insurance or self-insurance applicable at the time of the accident; or

(B) An unidentified motor vehicle that causes an accident resulting in injury provided the accident is reported to the police or proper governmental authority, and claimant notifies the claimant's insurer within thirty days or as soon as practicable thereafter, that the claimant or the claimant's legal representative has a legal action arising out of the accident.

(Emphasis added.)

 Under the clear and unambiguous language of the statutes governing UM and

---

12. HRS § 431:10C–103 (2005) currently provides:

"Uninsured motor vehicle" means any of the following:

(1) A motor vehicle for which there is no bodily injury liability insurance or self-insurance applicable at the time of the accident; or

(2) An unidentified motor vehicle that causes an accident resulting in injury; provided

the accident is reported to the police or proper governmental authority within thirty days or as soon as practicable thereafter.

13. The current definition of "underinsured motor vehicle" is essentially unchanged, except that in HRS § 431:10C–103 (2005), a comma was added after the word "maintenance[.]"

UIM insurance, therefore, UM and UIM policies must provide coverage for damages which an insured thereunder is "legally entitled to recover" from the owner or operator of an uninsured or underinsured vehicle, respectively, because of bodily injury or death. A prerequisite to a claim for UIM benefits "is the existence of 'bodily injury liability insurance coverage,' which is 'less than the liability for damages *imposed by law* '" on the owner or operator of the vehicle. *Ferreira,* 71 Haw. at 345, 790 P.2d at 913 (emphasis added) (brackets omitted).

The statutes governing UM and UIM insurance do not define what damages an insured "is legally entitled to recover" from the owner or operator of an uninsured or underinsured vehicle or what constitutes a vehicle owner or operator's "liability for damages imposed by law." However, HRS § 1–14 (1993) instructs that "[t]he words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning." Additionally, HRS § 1–16 (1993) provides that "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another."

▪ In motor vehicle accident cases such as the one giving rise to this appeal, HRS § 663–10.9(2)(F) imposes joint and several liability for "economic and noneconomic damages against joint tortfeasors in actions involving ... [t]orts relating to motor vehicle accidents except as provided in paragraph (4)[,]" [14] which paragraph is not applicable to the facts of this case. Pursuant to HRS § 663–11, the term "joint tortfeasors" is defined as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." "In this connection, 'liable' means 'subject to suit' or 'liable in a court of law or equity.'" *Gump v. Walmart Stores, Inc.,* 93 Hawai'i 428, 446, 5 P.3d 418, 436 (App.1999) (citing *Tamashiro v. De Gama,* 51 Haw. 74,

75, 450 P.2d 998, 1000 (1969)), overruled on other grounds, 93 Hawai'i 417, 5 P.3d 407 (2000).

▪ Under the principle of joint and several liability,

> either or any of the wrongdoers may be held liable for the whole of the damages resulting from their tortious acts. Consequently, where successive impacts by or collisions with different negligently operated vehicles contributed to, or combined to cause, the aggregate harm suffered, the plaintiff can recover the full amount of his [or her] damages from either one or all of the tortfeasors.

74 Am.Jur.2d *Torts* § 66 (2001). *See also Karasawa v. TIG Ins. Co.,* 88 Hawai'i 77, 81, 961 P.2d 1171, 1175 (App.1998) (holding that joint tortfeasors "are jointly and severally liable for the injury they caused to an injured party, HRS § 663–10.9, and the injured party is entitled to collect his or her entire damages from either tortfeasor").

▪ Construing the language of the statutes governing UM and UIM insurance according to their plain and commonly understood meaning and *in pari materia* with the statutes imposing joint and several liability in motor-vehicle-accident cases, it is clear that UM and UIM policies must provide coverage for all damages which an insured is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle, which necessarily encompasses damages for which the owner or operator of an uninsured or underinsured motor vehicle is jointly and severally liable pursuant to HRS §§ 663–10.9 and 663–11.

Liberty Mutual has not challenged on appeal the circuit court's determination that an arbitration panel awarded Labrador damages of $250,000 and apportioned liability "60% against Tolfree and 40% against the unidentified driver." Pursuant to HRS §§ 663–10.9 and 663–11, Labrador was legally entitled to recover all of her damages from Tolfree, and to the extent that Labrador's damages exceeded Tolfree's BI-liability coverage limits, Labrador was entitled to recover UM and

---

**14.** *See* footnote 8 for text of paragraph (4) of HRS § 663–10.9.

UIM benefits under her father's Liberty Mutual policy.

b.

Liberty Mutual's policy stated, with respect to UM coverage, in pertinent part, as follows:

## PART C—UNINSURED MOTORIST'S COVERAGE

. . . .

### INSURING AGREEMENT

We will pay damages which an **insured** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle because of [BI]**:

1. Sustained by an **insured**; and
2. Caused by an accident. ·

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle.**

Any judgment for damages arising out of a suit brought without our written consent is not binding on us.

**Insured** as used in this Part means:

1. You or any **family member.**
2. Any other person **occupying your covered auto.**
3. Any person for damages that person is entitled to recover because of [BI] to which this coverage applies sustained by a person described in 1. or 2. above.

**Uninsured motor vehicle** means a land motor vehicle or trailer of any type:

1. To which no [BI-]liability bond or policy applies at the time of the accident.
2. To which a [BI-]liability bond or policy applies at the time of the accident. In this case its limit for [BI] liability must be less than the minimum limit for [BI] liability specified by the financial responsibility law of Hawaii.
3. Which is a hit-and-run vehicle whose operator or owner cannot be identified and which hits or which causes an accident resulting in [BI] injury without hitting:
 a. you or any **family member.**
 b. a vehicle which you or any **family member** are **occupying**; or
 c. **your covered auto.**

. . . .

## OTHER INSURANCE

If there is other applicable similar insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.

(Underscored emphasis added.)

Liberty Mutual's policy included similar provisions for UIM coverage:

### INSURING AGREEMENT

We will pay damages which an **insured** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of [BI]:

1. Sustained by an **insured**; and
2. Caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **underinsured motor vehicle.**

We will pay under this coverage only after the limits of liability under any applicable [BI] liability bonds or policies have been exhausted by payment of judgments or settlements.

**Insured** as used in this endorsement means:

1. You or any **family member.**
2. Any other person **occupying your covered auto.**
3. Any person for damages that person is entitled to recover because of [BI] to which this coverage applies sustained by a person described in 1. or 2. above.

**Underinsured motor vehicle** means a land motor vehicle or trailer of any type to which a [BI-]liability bond or policy applies at the time of the accident but the amount paid for [BI] under the bond or policy to an **insured** is not enough to

pay the full amount the **insured** is legally entitled to recover as damages.

(Underscored emphases added.)

Under the clear and unambiguous terms of Labrador's policy with Liberty Mutual, which tracks the Hawai'i statutes regulating UM and UIM coverage, Liberty Mutual agreed to pay UM and UIM benefits for "damages which an **insured** is legally entitled to recover from the owner or operator of" an uninsured or underinsured motor vehicle "because of [BI] ... [s]ustained by an **insured**[.]" As a member of her father's household, Labrador was clearly an "insured" under the Liberty Mutual policy. Pursuant to the joint-and-several-liability statute, Labrador was also legally entitled to recover all her damages from Tolfree, the known tortfeasor.

Therefore, under Liberty Mutual's UM and UIM policy, Labrador was entitled to recover UM and UIM benefits.

c.

Liberty Mutual cites *Illinois Farmers Insurance Co. v. Hall*, 363 Ill.App.3d 989, 300 Ill.Dec. 530, 844 N.E.2d 973 (2006), in support of its position that joint-and-several liability applies only to actions in tort and not to contractual actions for UM and UIM benefits. However, the ruling in *Hall*, which related to a UM policy, appears to be *dictum*.[15] Moreover, the ruling was made without any discussion of the statutory requirements in Illinois for UM liability. The *Hall* decision is therefore not persuasive authority.

We are aware that other courts have concluded that statutes apportioning liability for tort purposes are not applicable to UM and UIM claims. *See, e.g., Kentucky Farm Bureau Mut. Ins. Co. v. Ryan*, 177 S.W.3d 797, 800 (Ky.2005); *Lahr v. Am. Family Mut. Ins. Co.*, 551 N.W.2d 732, 734 (Minn.Ct.App. 1996). However, both *Ryan* and *Lahr* are distinguishable.

In *Ryan*, Lawrence and Mildred Kruer (the Kruers) were instantly killed when their car was struck by an oncoming car that veered into the Kruers' lane to avoid an unidentified motorcyclist. 177 S.W.3d at 799. The Kruers' estate settled with the insurer of the driver of the oncoming car for BI-liability-policy limits and then filed a lawsuit for UIM coverage against the Kruers' own insurance policy. *Id.* The Kruers' insurer filed a third-party complaint against the unknown motorcyclist, and, pursuant to the trial court's instruction, the jury allocated fault between the oncoming driver and the unknown motorcyclist at fifty percent each. *Id.* The Kentucky Supreme Court noted that while no requirement exists in Kentucky that an unknown tortfeasor be named and/or served as a party in an action, under Kentucky's comparative-fault statute, a UIM insurer is liable to its insured only for damages exceeding the liability limits of the tortfeasor alleged to be underinsured. *Id.* at 801.

In *Lahr*, the injured passenger in a multi-vehicle accident pursued UIM benefits under the driver's policy, based on the other vehicle involved in the accident being underinsured. 551 N.W.2d at 732–33. The driver's insurer had already paid the injured passenger the BI-liability limits under the driver's policy. *Id.* at 733. *Lahr* therefore involved a claim for third-party insurance benefits, not a claim for first-party insurance benefits against the passenger's own insurer. In a similar factual situation, the Hawai'i Supreme Court held that dual recovery of BI-

---

**15.** The automobile policy at issue in *Hall* limited UM liability coverage to $250,000 per person per accident and $500,000 per occurrence. 844 N.E.2d at 975. The automobile insurer paid the $250,000–per–person liability limit to Arrid Hall (Hall), who was injured when a vehicle driven by an unidentified driver struck another vehicle, which then struck Hall and two other pedestrians. *Id.* at 974–75. Members of Hall's family sought loss-of-consortium damages under the policy and claimed that the $500,000–per–occurrence limit applied to each of the tortfeasors because more than one claimant existed. *Id.* at 974. They also claimed that they were entitled to receive up to $500,000, regardless of the value of their individual claims. *Id.* The Illinois Appellate Court held that under the unambiguous language of the policy, the per-person liability limit applied to "all damages" which expressly included "all the consequential damages sustained by other persons, such as * * * loss of society." *Id.* at 977. Therefore, the derivative loss-of-consortium claims by Hall's family members were included in the $250,000–per–person limit of liability as to Hall. *Id.* at 979.

liability and UIM benefits from a single policy is not allowed because allowing such recovery would, in effect, transform UIM coverage into BI-liability coverage and "create a duplication of liability benefits." *Kang*, 72 Haw. at 256, 815 P.2d at 1022.

### d.

In *Taylor v. Government Employees Insurance Co.*, the Hawai'i Supreme Court held that our UIM statute "is a remedial statute that must be liberally construed in order to accomplish the purpose for which it was enacted." (Brackets and internal quotation marks omitted.) The supreme court noted that when the legislature enacted into law the bill that "mandated that UIM coverage be included in all no-fault auto insurance policies sold in Hawai'i unless the insured rejected such coverage in writing[,]" the House Committee on Consumer Protection and Commerce reported that the purpose of the bill was as follows:

> The purpose of this bill is to require insurers to offer coverage for underinsured motor vehicles in motor vehicle insurance policies. Underinsured motorist coverage would then be treated in the same manner that uninsured motorist coverage is presently treated, i.e., to provide protection, through voluntary insurance, for persons who are injured by underinsured motorists whose liability policies are inadequate to pay for personal injuries caused by motor vehicle accidents.

*Taylor*, 90 Hawai'i at 308, 978 P.2d at 746 (quoting H. Stand. Comm. Rep. No. 1150–88, in 1988 House Journal, at 1248) (brackets omitted).

In this case, the record is undisputed that the total limits of Tolfree's BI-liability policies were inadequate to pay for all of the damages sustained by Labrador as a result of the accident. Furthermore, Labrador never sought to recover insurance benefits greater than her total damages, as determined by the arbitration panel.

The circuit court did not err in concluding that Liberty Mutual was liable under its contract to pay UIM benefits of $50,000 to Labrador.

### 2. *Whether Liberty Mutual Was Entitled to a Credit for the Total Amount of PEMCO's and H/S's UM–Policy Limits or the Total Amount of UM Payments Made to Labrador in Determining Liberty Mutual's UIM Obligation*

In *Taylor*, the Hawai'i Supreme Court held that where an insured under a UIM policy settles for less than the tortfeasor's BI-liability limits,

> the UIM insured agrees to forego compensation for the difference between the settlement amount and the tortfeasor's liability policy limits. The UIM carrier will not be responsible for covering that "gap" as a component of its obligation to compensate its insured for injury and damage exceeding the tortfeasor's limits.

*Id.* at 314, 978 P.2d at 752.

In this case, Labrador was determined to have sustained $250,000 in damages. Although Tolfree had a total of $200,000 in BI-liability coverage from PEMCO and H/S, Labrador settled with Tolfree for only $100,000 in BI-liability benefits. In accordance with *Taylor*, the circuit court, in calculating Liberty Mutual's liability for UIM benefits, credited Liberty Mutual with the full $200,000 BI limit of Tolfree's policies.

Liberty Mutual maintains that in determining whether Tolfree was "underinsured," the circuit court erred in failing to also credit Liberty Mutual with either the UM limits under the PEMCO and H/S policies, totaling $150,000, or the UM settlement payments made by PEMCO and H/S, totaling $90,000.

■ Liberty Mutual is incorrect.

The relevant portion of our UIM statute, HRS § 431:10C–301, provides:

**Required motor vehicle policy coverage** . . . .

(b) A motor vehicle insurance policy shall include:

. . . .

(3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage . . . in limits for bodily injury or death set forth in paragraph (1), . . . for the

protection of persons insured there-under who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; . . . and

(4) Coverage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles.

At the time the accident occurred, "underinsured motor vehicle" was defined as

a motor vehicle with respect to the ownership, maintenance or use for which *sum of the limits of all bodily injury liability insurance coverage* . . . applicable at the time of loss is less than the liability for damages imposed by law.

HRS § 431:10C–103 (emphasis added).

The statutory language is clear. To obtain UIM coverage in Hawaiʻi, the liability for damages must exceed the total amount of BI-liability limits applicable at the time of the loss. The policy limits for UM coverage and UM payments or settlements are not part of this analysis.

Accordingly, the circuit court correctly determined that the $250,000 in joint and several "damages imposed by law" against Tolfree exceeded the $200,000 in cumulative limits of Tolfree's BI-liability policies with PEMCO and H/S. Therefore, Tolfree met the statutory definition of a UIM, and Liberty Mutual was obligated to pay Labrador UIM benefits to compensate her for the $50,000 difference.

3. *Whether the Circuit Court Properly Awarded Attorney's Fees to Labrador*

■ Liberty Mutual contends that if it prevails on appeal, Labrador would not be the prevailing party, and, therefore, the circuit court's order awarding Labrador $6,705 in attorney's fees must be reversed. In light of our disposition of this appeal, this contention has no merit.

HRS § 431:10–242 provides currently, as it did when the accident occurred, as follows:

**Policyholder and other suits against insurer.** Where an insurer has contested its liability under a policy and is ordered by the courts to pay benefits under the policy, the policyholder, the beneficiary under a policy, or the person who has acquired the rights of the policyholder or beneficiary under the policy *shall be awarded* reasonable attorney's fees and the costs of the suit, in addition to the benefits under the policy.

(Emphasis added.) The plain language of HRS § 431:10–242 mandates an award of attorney's fees to "the policyholder, the beneficiary under a policy, or the person who has acquired the rights of the policyholder or beneficiary under the policy" whenever an insurer unsuccessfully contests its liability under a policy. Inasmuch as Liberty Mutual was not successful in contesting its liability to Labrador for UIM benefits, the plain language of HRS § 431:10–242 required that Labrador be awarded her attorney's fees.

Liberty Mutual points out that there were two disputed issues before the circuit court: (1) Labrador's entitlement to UM benefits, and (2) Labrador's entitlement to UIM benefits. Liberty Mutual argues that while Labrador may have prevailed on her UIM claim, the circuit court agreed with Liberty Mutual that it was not obligated to pay Labrador any UM benefits because its UM coverage was excess to PEMCO's and H/S's UM coverage. Therefore, Liberty Mutual argues, "fees should have been awarded to both parties, or no fees should have been awarded at all." This argument also fails.

"Generally, under the American Rule, each party is responsible for paying his or her own litigation expenses." *DFS Group L.P. v. Paiea Props.*, 110 Hawaiʻi 217, 219, 131 P.3d 500, 502 (2006) (citation and internal quotation marks omitted). Consequently, "[n]o attorney's fees may be awarded as damages or costs unless so provided by statute, stipulation, or agreement." *Food Pantry, Ltd. v. Waikiki Bus. Plaza, Inc.*, 58 Haw. 606, 618, 575 P.2d 869, 878 (1978). Liberty Mutual has not directed us to any statute, stipulation, or agreement that authorized an award of attorney's fees to Liberty Mutual.

## B. *Labrador's Appeal*

### 1. *The Circuit Court Did Not Abuse Its Discretion in Denying Prejudgment Interest to Labrador.*

Labrador argues that the circuit court abused its discretion in denying her prejudgment interest because the amount of UIM benefits was "liquidated" prior to Liberty Mutual filing the underlying declaratory judgment action, Liberty Mutual disputed coverage on multiple issues but abandoned or lost on all of them, and "[t]he very least the courts can do to try to encourage timely payment by eager-to-deny and delay insurers is to take away the insurers' ill-gotten gains—the insurers' profit from the use of the money awarded by the arbitrators pending a declaratory judgment action."

 "Prejudgment interest, where appropriate, is awardable under HRS § 636–16 [(1993)[16]] in the discretion of the court." *Page v. Domino's Pizza, Inc.*, 80 Hawai'i 204, 208, 908 P.2d 552, 556 (App.1995) (footnote added) (internal quotation marks omitted). The "well-established" purpose of the statute is to

> allow the court to designate the commencement date of interest in order to correct injustice when a judgment is delayed for a long period of time for any reason, including litigation delays. Another acknowledged purpose of HRS § 636–16 is to discourage recalcitrance and unwarranted delays in cases which should be more speedily resolved. A trial court's denial of prejudgment interest is usually affirmed if the party requesting the award

**16.** HRS § 636–16 provides:

> **Awarding interest.** In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

**17.** The Intermediate Court of Appeals in *Page* relied on the legislative history of HRS § 636–16 in gleaning its purpose:

> Your committee understands that at the present time interest is generally awarded commencing on the day the judgment is ren-

is found to have caused the delay, or if there is no showing that the non-moving party's conduct unduly delayed the proceedings of the case.

*Id.* at 209, 908 P.2d at 557 (citations, brackets, and ellipses omitted).[17]

 In spite of the lengthy litigation, the circuit court denied prejudgment interest to Labrador. The circuit court did, however, allow Labrador to file a counterclaim against Liberty Mutual for bad faith, which is still pending. Under the circumstances, we cannot conclude that the circuit court's denial of prejudgment interest to Labrador exceeded the bounds of reason or disregarded the rules and principles of law.

## PARTIAL OPINION OF THE COURT BY RECKTENWALD, C.J.

### 2. *Whether Liberty Mutual's "Other Insurance" Clause Was Valid*

The "other insurance" clause contained in Liberty Mutual's policy created a priority of coverage among multiple insurers, and did not limit or reduce Liberty Mutual's liability for UM payments to Labrador. Thus, the provision was valid and enforceable under Hawai'i law, and the circuit court did not err in denying Labrador's motion for partial summary judgment.

 We begin our analysis by recognizing that "liability insurers have the same rights as individuals to limit their liability, and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions

> dered. Where the issuance of a judgment is greatly delayed for any reason, such fixed commencement date can result in substantial injustice. Allowing the trial judge to designate the commencement date will permit more equitable results. Also, it is expected that party litigants will give serious regard to this discretion on the part of the trial judge so that those who may have had an unfair leverage by the arbitrariness of the prior rule will arrive at the realization that recalcitrance or unwarranted delays in cases which should be more speedily resolved will not enhance their position or assure them of a favorable award.

*Page*, 80 Hawai'i at 209 n. 5, 908 P.2d at 557 n. 5 (quoting S. Conf. Comm. Rep. No. 67, in 1979 Senate Journal, at 984) (formatting modified).

or public policy." *First Ins. Co. of Hawai'i v. State,* 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (quoting 6B J. Appleman, *Insurance Law and Practice* § 4255 at 40 (Buckley 1979)). Thus, the question here is whether the "other insurance" clause contravenes statutory provisions or public policy. We conclude that it does not.

HRS § 431:10C-301 provides, in relevant part:

> Required motor vehicle policy coverage....
>
> (b) A motor vehicle insurance policy shall include:
>
> ....
>
> (3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage provided therein or supplemental thereto, in limits for bodily injury or death set forth in paragraph (1), under provisions filed with and approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided that the coverage required under this paragraph shall not be applicable where any named insured in the policy shall reject the coverage in writing[.]

■ The statute requires that insurers provide coverage for any bodily injury or death sustained as a result of conduct of the owner or operator of any uninsured motor vehicle, unless that coverage is expressly rejected by the insured. The purpose of the statute is "to provide a remedy to the innocent victims of irresponsible motorists who may have no resources to satisfy the damages they cause[d] ... [i]deally, the purpose is to place those insured in the same position they would have occupied had the tortfeasor

carried liability insurance." *Dawes v. First Ins. Co. of Hawai'i,* 77 Hawai'i 117, 123, 883 P.2d 38, 44 (1994) (footnote and citation omitted). As a remedial statute, HRS § 431:10C-301(b)(3) is "to be construed liberally in order to accomplish the purpose for which it was enacted[.]" *Dines v. Pacific Ins. Co.,* 78 Hawai'i 325, 327, 893 P.2d 176, 178 (1995) (citation omitted). However, the statute does not expressly preclude Liberty Mutual from including a provision in its policy which sets forth priorities for payments when multiple UM insurers are involved.[18]

■ The Hawai'i Supreme Court has recognized that UM coverage is personal to the named insured; that is, UM coverage follows the insured's person. *Dawes,* 77 Hawai'i at 123, 883 P.2d at 44; *Palisbo v. Hawaiian Ins. & Guar. Co.,* 57 Haw. 10, 15, 547 P.2d 1350, 1354 (1976). Accordingly, a named insured is entitled to UM benefits even though he or she is injured while operating a vehicle not insured under the policy, *Allstate Ins. Co. v. Morgan,* 59 Haw. 44, 47–48, 575 P.2d 477, 479–80 (1978), or while occupying a vehicle not mentioned in the policy, *Methven–Abreu v. Hawaiian Ins. & Guar. Co.,* 73 Haw. 385, 396–98, 834 P.2d 279, 285–86 (1992); *Kau v. State Farm Mut. Auto. Ins. Co.,* 58 Haw. 49, 51, 564 P.2d 443, 444 (1977).

However, these cases are not dispositive of the validity of Liberty Mutual's "other insurance" clause. The principle that UM coverage is personal to the insured prohibits insurers from restricting UM coverage on the basis of the insured's location when he or she is injured. In contrast, Liberty Mutual's "other insurance" clause does not restrict UM coverage in such a manner, but rather designates its coverage as excess if other coverage is available to the insured. The clause has no effect in the absence of other available UM insurance. Accordingly, Liberty Mutual's "other insurance" clause does not violate the principle that UM coverage is

---

18. The fact that the legislature has set forth priorities for payments in the no-fault statute, HRS § 431:10C-305(b)(1) and (2) (1993), does not, in our view, establish an intention by the legislature to preclude insurers from including provisions in their policies establishing priorities for payments in the uninsured motorist context. *See In re*

*Water Use Permit Applications,* 94 Hawai'i 97, 151, 9 P.3d 409, 463 (2000); *see also State Farm Mut. Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 564, 836 P.2d 1074, 1080–81 (1992) (distinguishing between statutory analysis of an exclusion of coverage in the no-fault context and in the uninsured motorist context).

personal to the insured because the insured is still covered regardless of where he or she is injured. Other courts that recognize UM coverage as being personal to the insured have taken a similar position. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Powers*, 169 Vt. 230, 235, 732 A.2d 730, 734 (1999) (holding that insurers may designate their UM coverage as excess relative to other insurers and that such a holding did not contravene the proposition that UM coverage is "designed to protect persons, not vehicles"); *Aetna Casualty & Surety Co. v. CNA Ins. Co.*, 221 Conn. 779, 785, 606 A.2d 990, 993 (1992) (holding that "other insurance" clauses are valid for the purpose of establishing the order of coverage between insurers furnishing UIM coverage where statutes governing UM coverage apply equally to UIM coverage).[19]

The Hawai'i Supreme Court has also addressed the validity of an "other insurance" clause in the UM insurance context. In *Walton v. State Farm Mutual Automobile Insurance Co.*, 55 Haw. 326, 518 P.2d 1399 (1974), the insurance company attempted to escape all liability to the plaintiff on grounds that the plaintiff had already collected UM benefits from the host driver's insurer. The plaintiff had been seriously injured while a passenger in a car that was hit by an uninsured motorist. The plaintiff was insured as a passenger under the host driver's policy, as well as under his own personal-insurance policy. Both policies provided $10,000 in UM coverage. The plaintiff recovered $10,000 from the host driver's insurer and subsequently obtained a judgment against the uninsured motorist for a sum of $25,000. The uninsured motorist then filed for bankruptcy. The plaintiff sought to recover $10,000 in UM benefits from his own insurer,

but the insurer refused, relying on the following "other insurance" clause in the plaintiff's policy:

> [W]ith respect to bodily injury to an insured while occupying a motor vehicle not owned by a named insured under this coverage, the insurance hereunder shall apply only as excess insurance over any other similar insurance available to such occupant, and this insurance shall then apply only in the amount by which the applicable limit of liability of this coverage exceeds the sum of the applicable limits of liability of all such other insurance. (Emphasis in the original.)

*Id.* at 327 n.1, 518 P.2d at 1400 n.1.

By its terms, the plaintiff's insurance policy was only applicable in situations where its limit of liability exceeded the limits of liability of all such other insurance. Since the plaintiff's insurance policy provided maximum UM coverage of $10,000 and since the plaintiff had already collected $10,000 from the host driver's insurance policy, the provision excused the plaintiff's insurer from any duty to pay even though the plaintiff's damages amounted to $25,000. Thus, the "other insurance" clause effectively limited the insured's recovery of UM benefits to less than the actual damages sustained.

The Hawai'i Supreme Court invalidated the clause on the grounds that it was contrary to the protective purpose[20] of HRS § 431–448 (1968).[21] The court stated:

> While admittedly not determinative because of its nebulosity, "protection" as a statutory purpose is much more readily construed to invalidate, rather than validate, "other insurance" provisions, such as here relied upon by appellant-insurer, in cases such as this where appellee-insured

---

**19.** When the Hawai'i Supreme Court determined in *Dawes* that UM coverage was personal to the insured, it cited a Connecticut case for the proposition that "coverage attaches to the insured person, not the insured vehicle" and that "[a]n insured's status at the time of the injury, whether passenger, pedestrian, or driver of an insured or uninsured vehicle, is irrelevant to recovery under the statutorily mandated coverage." 77 Hawai'i at 124, 883 P.2d at 45 (quoting *Harvey v. Travelers Indem. Co.*, 188 Conn. 245, 248, 250, 449 A.2d 157, 159–60 (1982)). The court noted that the Connecticut statute was "similar in all mate-

rial respects" to Hawai'i's UM statute. *Dawes*, 77 Hawai'i at 124, 883 P.2d at 45.

**20.** The supreme court observed that "[t]he purpose of [the UM statute] is to promote protection, through voluntary insurance, for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents." *Walton*, 55 Haw. at 331, 518 P.2d at 1402.

**21.** HRS § 431–448 was the predecessor to HRS § 431:10C–301(b)(3).

has been damaged to the extent of $25,000, and yet has been compensated therefor only to the extent of $10,000.

*Id.* at 331, 518 P.2d at 1402.

The insured was therefore allowed to recover UM benefits from both his own insurer and his host driver's insurer. However, the supreme court specifically noted that the question before the court was a "narrow one," namely "whether the *provisions of the insurance policy cited above* ... shall be allowed to stand, in view of HRS § 431–448." *Id.* at 328, 518 P.2d at 1400 (emphasis added).

There is a crucial difference between the language in Liberty Mutual's "other insurance" clause and the "other insurance" clause that was invalidated in *Walton.* Liberty Mutual's "other insurance" clause provided that "any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance." Unlike the "other insurance" clause in *Walton,* the clause in the instant case does not reduce UM benefits to the insured below his or her actual damages. Rather, it establishes a priority system for determining the distribution of liability among multiple insurance carriers. Other states have upheld clauses like the one in the instant case despite invalidating clauses similar to the one in *Walton. See, e.g., State Farm Mut. Auto. Ins. Co. v. United Servs. Auto. Ass'n.,* 211 Va. 133, 137, 176 S.E.2d 327, 331 (1970) (upholding a provision similar to the one contained in Liberty Mutual's policy despite having previously invalidated a provision similar to the one contained in *Walton,* reasoning that "[t]he language before us now does not contain a limitation on the uninsured motorist statute which would permit an insurance company to escape all or a portion of its liability to the insured, thus depriving the insured of coverage to which he was legally entitled"); *Aetna,* 221 Conn. at 783-85, 606 A.2d at 992–93 (distinguishing between an "other insurance" clause which prohibits the insured from stacking coverages where the insured has not been fully indemnified for his damages from one which is used "for the purpose of determining the priority of payment between insurers"); *Gaught v. Evans,* 361 So.2d 1027,

1028–29 (Ala.1978) (differentiating between excess-escape clauses, similar to the clause in *Walton,* and excess clauses, like the one in Liberty Mutual's policy).

Liberty Mutual's "other insurance" clause is therefore consistent with the protective purpose of the statute because it "place[s] [Labrador] in the same position [she] would have occupied had the tortfeasor carried liability insurance," *Dawes,* 77 Hawai'i at 123, 883 P.2d at 44, and does not contravene public policy, *see Farmers Ins. Co. v. Prudential Prop. & Cas. Ins. Co.,* 10 Kan.App.2d 93, 97, 692 P.2d 393, 396 (1984) (noting that "a provision which does not dilute coverage but seeks to establish a priority of payments between insurers is not violative of public policy").

*Granger v. Government Employees Insurance Co.,* 111 Hawai'i 160, 168, 140 P.3d 393, 401 (2006), does not require the invalidation of Liberty Mutual's "other insurance" clause. *Granger* considered whether an insurer providing UIM coverage could refuse to consent to settlement in order to protect its subrogation rights after conducting a good faith investigation, and if so, whether the insurer should be required to tender payment to the insured equal to the tortfeasor's settlement offer. *Id.* at 165–66, 140 P.3d at 397–98. The Hawai'i Supreme Court held that an insurer may, after investigation, refuse to consent in order to protect its subrogation rights. *Id.* at 166, 140 P.3d at 399. However, the supreme court also held that if the insurer refuses to consent to the proposed settlement, then it must tender the insured an amount equivalent to the settlement offer. *Id.* at 168, 140 P.3d at 401.

The supreme court reasoned that "if [an insurer], in good faith, prefers to prolong the lawsuit against [the tortfeasor] for its own benefit, it may do so," but the insurer cannot at the same time "conscript [the insured] as its 'vicarious plaintiff' for the purpose of recovering, at substantial cost, funds that [the insured] already paid [the insurer] to bear the risk of providing in the event of an underinsured injury." *Id.* Therefore, on remand the insurer was required to either (1) consent to the proposed settlement or (2) pay the insured the proposed settlement amount. *Id.*

In short, *Granger* addressed the question of whether and under what conditions a UIM insurer may refuse to consent to a settlement by its insured. In contrast, the order at issue here did not address whether and under what circumstances Liberty Mutual could, under the terms of its UM policy and applicable law, refuse to consent to a settlement by Labrador with the other UM insurers. Rather, the circuit court's March 17, 2003 order regarding Liberty Mutual's cross-motion for summary judgment concluded only that H/S's policy "was primary in regard to UM benefits to Labrador and Liberty Mutual's policy provides excess coverage." That narrow holding, without more, does not allow Liberty Mutual to use its "other insurance" clause to "conscript [Labrador] as its 'vicarious plaintiff.'" *Id.* at 168, 140 P.3d at 401.

Moreover, Liberty Mutual did not use its "other insurance" clause to substantially delay payment of UM benefits to Labrador. It was not until April 24, 2001—more than six years after the accident that injured Labrador—that Labrador's counsel wrote a letter to Liberty Mutual requesting that it pay UM benefits on the basis that there had been two tortfeasors, Elisa Tolfree and the unidentified driver of the unidentified truck. Labrador, Liberty Mutual, and H/S subsequently agreed to a private arbitration of Labrador's UM claim to be held on November 28, 2001, although Liberty Mutual repeatedly asserted that its coverage would be excess to other available UM insurance.[22]

In a letter dated October 31, 2001, Labrador offered to settle with Liberty Mutual and H/S for three-fifths of their respective UM policy limits. H/S agreed to the settlement, but Liberty Mutual refused. On November 28, 2001, the scheduled arbitration was held between Labrador and Liberty Mutual. On December 20, 2001, the arbitration panel issued an award for $250,000 to Labrador and found that the driver of the phantom truck

was responsible for forty percent. Thus, the damages attributable to the uninsured motorist ($100,000) were less than the aggregate limits of the PEMCO and H/S UM policies ($150,000). Consistent with its interpretation of its own UM policy, Liberty Mutual declined to pay UM benefits to Labrador after the arbitration, and instead continued to seek a determination of its obligations in this litigation.

Thus it took only about eight months from Labrador's assertion of her UM claim in April, 2001 for the arbitration award to issue in December, 2001. At that point, it was clear under the terms of the respective "other insurance" clauses that Liberty Mutual's coverage was excess and that Liberty Mutual was not obligated to pay UM benefits since the damages attributable to the uninsured driver were less than the policy limits of the primary UM policies. The eight-month period between the initial assertion of the claim and the issuance of the arbitration award was not, in our view, an undue delay or one that suggests that "other insurance" clauses such as the Liberty Mutual provision at issue here contain an inherent potential for abuse that requires their invalidation.

In sum, neither the express terms of the statute nor any public policy prohibits insurers from including "other insurance" clauses such as the one used by Liberty Mutual in their UM policies. Moreover, such clauses serve valid purposes, such as helping to keep costs of premiums down. By allowing insurance companies to set the priority of payment through excess provisions, they are better able to assess the risk of providing the coverage and to charge the insured accordingly. Rates may increase, however, if insurers are required to serve as the primary insurer in every instance. *See Mustain v. United States Fid. & Guar.*, 925 P.2d 533, 539 (Okla.1996) (5–4 decision) (Summers, J., dissenting) ("[Excess clauses] serve valid

---

**22.** For example, in a letter dated September 26, 2001 to Tolfree's counsel and copied to Labrador's counsel, Liberty Mutual expressly reserved the right to file a declaratory judgment action to determine, inter alia, whether H/S's "UM policy is primary." In a letter dated October 5, 2001, to the arbitration panel and copied to Labrador's counsel, Liberty Mutual indicated that it in fact

"intend[ed]" to file a declaratory judgment action that would address that issue. Liberty Mutual filed its complaint on November 21, 2001, seeking, inter alia, declarations that any obligation on the part of Liberty Mutual to pay UM benefits was "excess over and above the primary uninsured motorist ... policy limits" available under the H/S and PEMCO policies.

functions. They establish which insurer has the duty to investigate and defend. The primary insurer has the first duty to defend. The excess insurer does not expect to be called on for these costs, and charges the insured accordingly. Second, the clause guards against the duplication of benefits. Third, these clauses help keep the costs of premiums down.") (internal citations omitted).

Finally, we note that this case does not involve a situation in which multiple insurers claim that their respective policies provide only excess coverage. To the contrary, the policies here were consistent with regard to which policies were primary and which were excess. If and when a situation arises in which multiple insurers each try to characterize their respective policies as excess, there are means available to ensure that the legitimate interests of insureds are not compromised by such a dispute.[23]

For the foregoing reasons, Liberty Mutual's "other insurance" clause is consistent with Hawai'i case law and statutes, and the circuit court did not err in denying Labrador's motion for partial summary judgment.

## III. CONCLUSION

In light of the foregoing discussion, we:

(1) Affirm the December 4, 2002 "Findings of Fact, Conclusions of Law, and Order Granting [Labrador's] Motion for Partial Summary Judgment Against [Liberty Mutual] Filed on October 3, 2002, and Denying [Liberty Mutual's] Motion for Summary Judgment Against [Labrador] Filed on October 3, 2002";

(2) Affirm the February 6, 2003 "Order Denying [Liberty Mutual's] Motion for Reconsideration of the Findings of Fact, Conclusions of Law, and Order Granting [Labrador's] Motion for Partial Summary Judgment Against [Liberty Mutual] Filed on October 3, 2002, and Denying [Liberty Mutual's] Motion for Summary Judgment, Filed on December 17, 2002";

(3) Affirm the March 17, 2003 "Order Granting in Part and Denying in Part [Labrador's] Motion for Attorneys Fees and Prejudgment Interest Incurred in Obtaining UIM Benefits, Filed on October 30, 2002";

(4) Affirm that part of the March 17, 2003 "Order Denying [Labrador's] Motion for Reconsideration; Motion re: Equitable Estoppel; Motion to Set Case for Trial, Filed June 27, 2002," which denied Labrador's motion for reconsideration of the circuit court's ruling that the "other insurance" provision in Liberty Mutual's policy "was not unenforceable as a matter of public policy";

(5) Affirm that part of the March 17, 2003 "Order Denying [Labrador's] Motion for Partial Summary Judgment Against [Liberty Mutual], Filed 02/27/02, and Granting in Part and Denying in Part [Liberty Mutual's] Cross–Motion for Summary Judgment, Filed 03/08/02," which determined that Liberty Mutual's policy was "excess" to the H/S policy; and

(6) Affirm the July 21, 2005 Final Judgment, which entered judgment in favor of Labrador and against Liberty Mutual in accordance with the foregoing orders and held that Liberty Mutual was obligated to pay $50,000 in UIM benefits and $6,705 in attorney's fees to Labrador.

Dissenting Opinion by WATANABE, J.

I respectfully dissent as to the partial majority opinion in Part II.B.2., upholding the validity of Liberty Mutual's excess "other insurance" clause.

As is typical of insurance policies nationwide, the PEMCO, H/S, and Liberty Mutual policies in this case all included provisions

---

**23.** For example, some courts that have considered multiple excess "other insurance" clauses have resolved conflicts between those clauses by treating both coverages as primary. *See Universal Underwriters Ins. Co. v. Allstate Ins. Co.,* 99 Md.App. 595, 603, 638 A.2d 1220, 1224 (1994) (noting that when two excess clauses are applicable and "directly conflict" the majority rule is that they "are to be disregarded (as mutually repugnant) and each of the coverages is treated as primary insurance (and the liability is prorated)"); *Westfield Ins. Co. v. Nationwide Mut. Ins. Co.,* 99 Ohio App.3d 114, 122, 650 N.E.2d 112, 117 (1993) (holding that where conflicting "excess" coverage clauses appeared to cancel each other out with respect to non-owned vehicles each insurer owed a pro rata share of total loss).

that limited or eliminated each respective insurer's liability for UM or UIM payment in the event that "other insurance" was available to cover an insured's loss. Such "other insured" clauses have spawned a tremendous amount of litigation across the country and have been the focus of much legal commentary. *See, e.g.,* Annotation, *Uninsured Motorist Insurance: Validity and Construction of "Other Insurance" Provisions,* 28 A.L.R.3d 551 (1969); John James Ciavardoni, 3 No–Fault and Uninsured Motorist Automobile Insurance § 31.40 (2008); Alan I. Widiss and Jeffrey E. Thomas, 1 Uninsured and Underinsured Motorist Insurance ch. 13, at 795–905, and 3 Uninsured and Underinsured Motorist Insurance ch. 40, at 371–418 (3d ed.2005); Paul A. Morello, Jr., *The Problem of Multiple Uninsured Motorist Coverages: Who Pays?,* 62 Conn. B.J. 358 (1988); R.J. Robertson, Jr., *"Other Insurance" Clauses in Illinois,* 20 S. Ill. U. L.J. 403 (1996).

"Other insurance" clauses generally fall into one of three categories or any combination thereof:

> (a) excess; (b) escape; and (c) pro-rata. An "excess" other insurance clause generally provides that if there is other valid and collectible insurance which covers the loss, the excess policy is applicable if the loss exceeds the policy limits of the primary insurer. An "escape" other insurance clause generally provides that the existence of other [UM] insurance extinguishes the insurer's liability to the extent of that other insurance. A "pro-rata" other insurance clause generally provides that if there is other valid and collectible insurance which covers the loss, the insurer is liable only for its pro-rata share of the loss, that is, the proportion that the particular policy limits bears to the total applicable policy limits.

Morello, 62 Conn. B.J. at 358–59 (footnotes omitted).

In this case, the PEMCO, H/S, and Liberty Mutual insurance policies all contained similar "excess" and "pro-rata" other insurance clauses. Construing these clauses, the circuit court determined that because the PEMCO and H/S policies insured Tolfree, whose vehicle was involved in the accident, the plain language of the PEMCO and H/S policies rendered the excess clauses therein inapplicable, and, therefore, the PEMCO and H/S policies provided Labrador primary UM coverage. The circuit court also concluded that because Liberty Mutual's policy covered the Labrador family and none of the vehicles covered under that policy was involved in the accident, Liberty Mutual's policy provided Labrador "excess" UM coverage and Labrador must exhaust PEMCO's $100,000 UM-policy limits and H/S's $50,000 UM-policy limits before pursuing Liberty Mutual's $140,000 stacked-UM policy. The circuit court also concluded that Liberty Mutual's "excess" other insurance clause was not void as contrary to public policy:

> Arguments can be made that Liberty Mutual's other insurance provision under which it justifies its excess position is not enforceable as a matter of public policy. First, under Hawaii law, UM coverage is intended to cover the person regardless of what vehicle he or she is injured in. *Dawes v. First Insurance Co. of Hawai'i Ltd.,* 77 Hawai'i 117, 123[, 883 P.2d 38] (1994). Second, Labrador's parents actually paid Liberty Mutual for the UM coverage to be afforded to Labrador. In contrast, Tolfree or her father made payment for the UM coverage to be afforded to Labrador under the [H/S] and PEMCO policies. The legislative policy of providing UM benefits to insureds who purchase UM coverage should not be hindered by coverage disputes arising from the existence of multiple policies providing the same coverage. *See e.g.: Schmidt v. City of Gladstone,* 913 S.W.2d 937 (Mo.App. W.[D.]1996).
>
> However, the Court declines to adopt these arguments because Liberty Mutual's excess insurance provision does not reduce the UM benefits payable to Labrador, but merely sets forth priorities for payments under multiple policies.

Labrador argues on appeal that the circuit court erred when it denied her motion for partial summary judgment and determined that Liberty Mutual's liability for UM payments to Labrador was "in excess" of the PEMCO and Sentinel policies. She chal-

lenges the decision on the grounds that the provision is against public policy.

For the reasons that follow, I would conclude that the excess "other insurance" clause in Liberty Mutual's policy invalidly limited Liberty Mutual's UM liability, as defined by Hawai'i statutes and case law, is against public policy and is, therefore, void and unenforceable.

### 1.

Initially, it is important to note that Hawai'i statutes and administrative rules do not currently establish any priorities regarding which UM- or UIM-insurance policy must be exhausted first when multiple overlapping insurance coverage is available to cover the same liability.

In contrast, other statutes pertaining to motor vehicle insurance do establish priority of coverages. For example, HRS § 431:10C–305(b)(1) (2005) provides that "[e]xcept as provided in paragraph (2), personal injury protection benefits shall be paid primarily from ... (A) [t]he insurance on the vehicle occupied by the injured person at the time of the accident; or (B) [t]he insurance on the vehicle which caused accidental harm if the injured person is a pedestrian (including a bicyclist)." HRS § 431:10C–305(b)(2) provides generally that "[a]ll personal injury protection benefits shall be paid secondarily and net of any benefits a person is entitled to receive because of the accidental harm from workers' compensation laws[.]"

The silence of the legislature and the state insurance commissioner on this issue is, in my opinion, instructive.

### 2.

Although "insurers have the same rights as individuals to limit their liability and to impose whatever conditions they please on

their obligation," *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 411, 992 P.2d 93, 106 (2000) (internal quotation marks and brackets omitted), the Hawai'i Supreme Court has emphasized repeatedly that insurers may not limit their liability "in contravention of statutory inhibitions or public policy." *Id.*

In *Walton v. State Farm Mutual Automobile Insurance Co.*, 55 Haw. 326, 331, 518 P.2d 1399, 1402 (1974), for example, the supreme court invalidated an "other insurance" clause in a UM policy which limited the insurer's liability to "the amount by which the applicable limit of liability of this coverage exceeds the sum of the applicable limits of liability of all such other insurance." *Id.* at 327 n. 1, 518 P.2d at 1400 n. 1. The plaintiff in *Walton* had been seriously injured as a passenger in a car that collided with a car driven by a UM. *Id.* at 326, 518 P.2d at 1399. The plaintiff recovered $10,000 from the insurer of the driver of the car he was riding in, the maximum recoverable under the driver's UM policy. *Id.* at 326, 518 P.2d at 1399–1400. The plaintiff obtained a final judgment for $25,000 against the UM, who then filed for bankruptcy. *Id.* at 326–27, 518 P.2d at 1400. The plaintiff then sought to collect $10,000 in UM benefits from his own UM insurer, which refused coverage, based on an excess insurance clause.[1] *Id.* at 327, 518 P.2d at 1400. The insurer claimed that under the "other insurance" clause, it was excused from making any payment since the plaintiff's UM coverage was for $10,000 and the plaintiff had collected $10,000 in UM benefits from the driver's insurer. *Id.* at 327–28, 518 P.2d at 1400.

The supreme court, in adopting the "majority rule," held that the "other insurance" clause at issue violated HRS § 431–448 (1968),[2] the predecessor to HRS § 431:10C–

---

**1.** The insurance provision at issue in *Walton* stated as follows:

Under coverage U [UM provisions] with respect to *bodily injury* to an *insured* while *occupying* a motor vehicle not owned by a named insured under this coverage, the insurance hereunder shall apply only as excess insurance over any other similar insurance available to such occupant, and this insurance shall then apply only in the amount by which the applica-

ble limit of liability of this coverage exceeds the sum of the applicable limits of liability of all such other insurance. [Emphasis in the original.]

*Walton*, 55 Haw. at 327 n. 1, 518 P.2d at 1400 n. 1.

**2.** At the time *Walton* was decided, HRS § 431–448 provided, in relevant part, as follows:

301(b)(3), because the clause "reduce[d] the benefits directly payable by the injured-insured's insurer to a sum below the statutory minimum" of "not less than $10,000 because of bodily injury to ... one person in any one accident." *Id.* at 329, 518 P.2d at 1401 (internal quotation marks omitted). In voiding the "other insurance" clause, the supreme court noted that the purpose of UM coverage is "to promote protection, through voluntary insurance, for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents[.]" *Id.* at 331, 518 P.2d at 1402 (quoting H. Stand. Comm. Rep. No. 194 on House Bill No. 26, which became HRS § 431–448, 1965 House Journal, at 582). This protective purpose, the supreme court said, would not be accomplished if an insured "has been damaged to the extent of $25,000, and yet has been compensated therefor only to the extent of $10,000." *Id.*

The supreme court also rejected the insurer's arguments that invalidating the "other insurance" provision of the policy would "permit inequitable 'stacking' or 'pyramiding' by allowing appellee-insured to be placed in a better position than he would have been had the [UM] been insured for the statutory minimum":

> The simple reply is that there is no reason to conjecture about how much insurance the uninsured might have had, had he [or she] had any at all, by assuming that he [or she] would have had $10,000. Any motorist might have more insurance than $10,000, or, if he [or she] be a self-insurer, the hypothetical "other driver" might have had ability to satisfy judgments in excess of the statutory minimum of $10,000. *Compensation for the injured party* is the more important focus of inquiry. Therefore, there would be inequity only if insured tried to "pyramid" or "stack" several policy provisions to build up to a sum

beyond his damage, and thus gain a windfall. But where the "pyramiding" or "stacking" would result in a sum equal to or less than insured's damage, to refuse to permit pyramiding would award the *insurer* the windfall, based on the none too compelling assumption that the uninsured would have only been insured to the statutory minimum. "This assumption is not required and we cannot accept it. What insured would have received from an uninsured motorist is purely a matter of speculation." *Werley v. United Services Automobile Association,* 498 P.2d 112, 119 (Alaska 1972).

We believe that the majority rule is better grounded in logic and reason than is the minority view. In addition, two other, supplementary arguments have been adduced in defense of the majority position. *First of all, permitting recovery under both [UM] coverages (but only until insured is indemnified for losses) avoids the potentially intricate problems involved in deciding whether injured-insured's own, or host driver's own, "[UM]" coverage is considered the "excess" (or "secondary coverage") where both injured-insured and host driver have policy provisions such as those involved in the case at bar. Both insurers could, and sometimes have, disclaimed liability by pointing to the other insurer as the "primary" insurer. The key policy word is "available." It has been held that in such cases neither "other insurance" provision is valid. Lamb–Weston, Inc. v. Oregon Auto. Ins. Co.,* 219 [Or.] 110, 341 P.2d 110 (1959); *Werley v. United Services Automobile Association, supra,* at 116–120.

Secondly and most importantly, *it has been held to be unconscionable to permit an insurer to collect a premium for coverage of a type that the insurer is obligated*

---

Automobile liability; coverage for damage by uninsured motor vehicle. No automobile liability or motor vehicle liability policy ... shall be delivered, issued for delivery, or renewed in this State ... unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 287–7, under provisions filed with and approved by the insurance commissioner, for

the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles ... provided, however, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage in writing. *Id.* at 328, 518 P.2d at 1400.

*by statute to provide and then to permit the insurer to use language insurer itself devised to avoid liability. Simpson v. State Farm Mutual Automobile Insurance Co.*, 318 F.Supp. 1152, 1156 (S.D.Ind.1970); *Blakeslee v. Farm Bureau Mutual Ins. Co.*, 388 Mich. 464, 474, 201 N.W.2d 786, 791 (1972). More pithily stated: "insurer charged a premium for the coverage; it cannot be permitted to vanish as the pea in the shell game", *Kraft v. Allstate Insurance Company*, 6 Ariz.App. 276, 431 P.2d 917 (1967).

55 Haw. at 332–33, 518 P.2d at 1402–03 (emphases added; footnotes and brackets omitted).

### 3.

The supreme court has not hesitated to invalidate other provisions in insurance policies that limit an insurer's statutory liability. *See, e.g., DeMello v. First Ins. Co. of Hawaii*, 55 Haw. 519, 523 P.2d 304 (1974) (invalidating a UM-policy provision requiring "physical contact" between an insured vehicle and a hit-and-run vehicle before the insurer would pay UM benefits); *Kau v. State Farm Mut. Auto. Ins. Co.*, 58 Haw. 49, 564 P.2d 443 (1977) (per curiam) (invalidating an exclusionary clause in a UM policy on grounds that the clause violated HRS § 431–448 by denying liability to an insured under the policy on the basis that at the time of the injury, the insured was not occupying an "owned motor vehicle" as defined in the policy); *Nat'l Union Fire Ins. Co. v. Olson*, 69 Haw. 559, 563, 751 P.2d 666, 668–69 (1988) (holding that a UM policy cannot restrict coverage to persons "occupying" a covered vehicle because HRS § 431–448 requires that UM insurance cover "the ownership, maintenance, or use of the vehicle"), overruled in part on other grounds, *Dawes v. First Ins. Co. of Hawai'i*, 77 Hawai'i 117, 131, 883 P.2d 38, 52 (1994); *Sol v. AIG Hawai'i Ins. Co.*, 76 Hawai'i 304, 309, 875 P.2d 921, 926 (1994) (holding invalid a policy provision dictating that the amount payable in UM benefits be reduced by any no-fault payments made under the policy because the provision was in conflict with the legislature's expressed intent to prevent a no-fault insurer from subrogating against optional UM benefits and

state-insurance statute allowed duplicate recovery of optional UM benefits); *Caberto v. Nat'l Union Fire Ins. Co.*, 77 Hawai'i 39, 45–46, 881 P.2d 526, 532–33 (1994) (invalidating, based on *Sol*, a clause requiring reimbursement of no-fault benefits paid from UIM benefits received; and holding that a clause requiring reduction in the payment of optional UM or UIM benefits based on the amount of workers' compensation benefits received was void because the clause defeated the purpose of optional additional coverage and resulted in a windfall to the insurer merely because the insured happened to be in the course and scope of his employment at the time of injury); *Kaiama v. AIG Hawai'i Ins. Co.*, 84 Hawai'i 133, 136–37, 930 P.2d 1352, 1355–56 (1997) (invalidating, as against public policy, a family-member exclusion denying UIM coverage to a covered family member injured by negligence of another named insured); *Taylor v. Gov't Employees Ins. Co.*, 90 Hawai'i 302, 312–13, 978 P.2d 740, 750–51 (1999) (holding void, as against public policy and the purposes of the no-fault insurance law, a clause requiring an insured to exhaust the full amount of a tortfeasor's liability insurance policy before seeking UIM benefits); and *Mikelson v. United Servs. Auto. Ass'n*, 107 Hawai'i 192, 208–10, 111 P.3d 601, 617–19 (2005) (invalidating an exclusion for BI and property damages sustained by a person while occupying a vehicle not insured under a UIM policy but owned by a named insured under the policy, as well as an exclusion for vehicles with "less than four wheels").

### 4.

In this case, Liberty Mutual's excess "other insurance" clause provided that "any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance." The clause thus limited Liberty Mutual's liability by requiring that UM policies covering vehicles not owned by its insured that are involved in an accident involving its insured must first be exhausted before Liberty Mutual's UM liability to its own insured would kick in. I don't believe that such a limitation of liability is allowed under Hawai'i law.

First, pursuant to HRS § 431:10C–301(b)(3), a UM policy is "for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles[.]" Other courts have construed similar statutory language as precluding an insurance company from circumventing the clear mandate of the statute by withholding the required protection through an "other insurance" clause. *See, e.g., Sellers v. U.S. Fid. & Guar. Co.,* 185 So.2d 689, 690–92 (Fla.1966) (holding that a statute requiring that no automobile liability insurance shall be delivered unless coverage is provided "for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of [BI]" operates to invalidate a condition in an insurance policy that limits the insurer's liability and is inconsistent with the statutory requirement); *State Farm Mut. Auto. Ins. Co. v. Barnard,* 115 Ga.App. 857, 156 S.E.2d 148, 149–50 (1967) (holding that Georgia's Uninsured Motorist Act "is plain and unambiguous in requiring all liability policies to undertake to pay the insured 'all sums which he [or she] shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle[,]'" and because "[t]here appears no latitude ... for an insurer limiting its liability through 'other insurance'; 'excess-escape' or 'pro rata' clauses, ... all inconsistent clauses in the policy to the controlling statutory language ... must be judicially rejected'"); *Harthcock v. State Farm Mut. Auto. Ins. Co.,* 248 So.2d 456, 462 (Miss.1971) (holding that a statute similar to Hawaii's that describes what must be included in a UM policy "is mandatory on the insurer and this undertaking cannot be diminished by a provision in the policy" limiting the insurer's liability); *Schmidt v. City of Gladstone,* 913 S.W.2d 937, 940–41 (Mo.Ct.App.1996) (holding that "Missouri's public policy prevents the enforceability of [insurer's] 'other insurance' clause" because "[t]he [UM] coverage required by Missouri law is not based on the vehicle in which the insured is operating or riding, but instead is personal coverage which follows the insured" and if the insurer's "qualification on liability were enforced,

the bright line of the legislature's mandatory [UM] coverage would be impaired"); *Vernon v. Harleysville Mut. Cas. Co.,* 244 S.C. 152, 135 S.E.2d 841, 843–44 (1964) (stating that insurer's UM endorsement, which excluded coverage where there was "other insurance," was an invalid "limitation upon the statutory coverage required by [the South Carolina UM Act]"); *Bryant v. State Farm Mut. Auto. Ins. Co.,* 205 Va. 897, 140 S.E.2d 817, 820 (1965) (holding invalid an "other insurance" provision of a policy because it conflicted with the "plain language" of a statutory requirement very similar to Hawaii's and "[t]here is no limitation or qualification of this language anywhere in the statute, nothing at all to indicate that it does not mean what it says").

Second, the purpose of our UM statute is to

> provide a remedy where injury is caused by an uninsured motorist; or, as has been more frequently stated, to provide a remedy to the innocent victims of irresponsible motorists who may have no resources to satisfy the damages they cause. This recourse is provided, then, to cover the situation of a wrongful or tortious act of an uninsured motorist or a hit and run driver, or that of another unknown motorist.
>
> ... Ideally, the purpose is to place those insured in the same position they would have occupied had the tortfeasor carried liability insurance[.]

*Dawes,* 77 Hawai'i at 123, 883 P.2d at 44 (footnote and brackets omitted). In *Dawes,* the Hawai'i Supreme Court explained that

> [t]wo general principles apply to UM insurance coverage. First, *either* "an insured *or* an insured vehicle must be involved in the accident in order to collect under the UM endorsement." 12A J. Couch, *Cyclopedia of Insurance Law* § 45:634, at 127 (R. Anderson and M. Rhodes 2d ed.1981) [hereafter Couch] (emphasis added). This is because "the uninsured motorist policy is personal to the insured," *Palisbo v. Hawaiian Ins. & Guar. Co., Ltd.,* 57 Haw. 10, 15, 547 P.2d 1350, 1354 (1976) (emphasis added), or, put differently, the UM coverage follows the insured's person. Accordingly,

the nature of [UM] insurance is such that an insured is covered whether or not he or she is injured while in a vehicle which is insured under the policy. An insured under the policy is entitled to recover [UM] insurance benefits even though she is injured while operating a vehicle not covered by the policy.

*Allstate Ins. Co. v. Morgan,* 59 Haw. 44, 47–48, 575 P.2d 477, 479–80 (1978). Second, "almost all modern forms of UM coverage include *passengers,* or occupants, of an automobile injured by [a UM]; indeed an exclusion of them would, in most states, be invalid." 8C Appleman § 5080.45, at 255–56 (1981) (footnote omitted and emphasis added).

Construing a statute similar in all material respects to HRS §§ 431:10–213 and 431:10C–301(b)(3), the Connecticut Supreme Court aptly elaborated upon these general principles as follows:

> Required [UM] coverage is "person oriented." The public policy embodied in the UM statute directs that uninsured motorist coverage be provided to insureds when they are not occupants of insured vehicles as well as when they are.
>
> Our [UM] insurance statute provides coverage for *"persons* insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles." (Emphasis added.) The coverage attaches to the insured person, not the insured vehicle. Thus, this court has held that an injured party may receive the benefits of a policy even though not occupying a vehicle insured under that policy.
>
> An insured's status at the time of the injury, whether passenger, pedestrian, or driver of an insured or uninsured vehicle, is irrelevant to recover under the statutorily mandated coverage. The coverage is portable: The insured and family members are insured no matter where they are injured. They are insured when injured in an owned vehicle named in the policy, in an owned vehicle not named in the policy, in an unowned vehicle, on a motorcycle, on a bicycle,

whether afoot or on horseback or even on a pogo stick or in a rocking chair on one's front porch. *[UM] statutes place no geographical limits on coverage* and do not purport to tie protection against uninsured motorists to occupancy of an insured vehicle. [UM] protection [sic] of coverage for persons, not for vehicles.

*Id.* at 123–24, 883 P.2d at 44–45 (footnotes, brackets, and ellipses omitted).

Subsequently, in *Dines v. Pacific Insurance Co.,* 78 Hawai'i 325, 893 P.2d 176 (1995), the supreme court reiterated that

> the following propositions are established elements of this state's insurance law: (1) UM insurance coverage is personal to the named insured; (2) the public policy underlying HRS § 431:10C–301(b)(3) mandates that the insured vehicle (*i.e.,* the "covered auto" named in the policy) need not be involved in the accident in order for the named insured to be entitled to collect UM benefits; (3) UM coverage attaches to the named insured's person and not the insured vehicle; and, therefore, (4) a named insured, injured by an uninsured motorist from whom the named insured is legally entitled to recover damages, is entitled to UM coverage no matter where he or she is injured, whether the injury occurs while the named insured is (a) occupying an insured motor vehicle, (b) occupying an uninsured but owned motor vehicle, *Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.,* 73 Haw. 385, 394–96, 834 P.2d 279, 285–86, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992); *Kau v. State Farm Mut. Auto. Ins. Co.,* 58 Haw. 49, 51, 564 P.2d 443 (1977), (c) occupying an unowned motor vehicle, (d) on a motorcycle, (e) on a bicycle, (f) on horseback, (g) on a pogo stick, (h) on foot, or (i) in a rocking chair on a front porch.

*Id.* at 328, 893 P.2d at 179.

Hawai'i statutes and case law are thus clear that UM insurance coverage follows the named insured, not the vehicle. Liberty Mutual's excess "other insurance" clause, by requiring that other UM policies covering a vehicle involved in an accident provide primary coverage and Liberty Mutual's UM policy provide only secondary coverage, thus

violated our statutes and case law and is, in my opinion, invalid and void.

### 5.

The Hawai'i Supreme Court has recognized that

> because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, . . . they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.

*Guajardo v. AIG Hawai'i Ins. Co.,* 118 Hawai'i 196, 202, 187 P.3d 580, 586 (2008) (citations omitted); *Allstate Ins. Co. v. Pruett,* 118 Hawai'i 174, 179, 186 P.3d 609, 614 (2008). In addition, "an insurer cannot 'conscript the insured as its "vicarious plaintiff" for the purpose of recovering, at substantial cost, funds that the insured already paid the insurer to bear the risk of providing in the event of an underinsured injury.'" *Guajardo,* 118 Hawai'i at 205–06, 187 P.3d at 589–90 (quoting *Granger v. Gov't Employees Ins. Co.,* 111 Hawai'i 160, 168, 140 P.3d 393, 401 (2006)) (brackets omitted).

In *Granger,* the plaintiff-insured (Granger) sustained injuries in excess of $100,000 when she was rear-ended by another driver (Chong). 111 Hawai'i at 162, 140 P.3d at 395. Chong had a liability policy limit of $100,000; Granger had UIM coverage through her carrier, GEICO, and she informed GEICO of her intent to file a UIM claim. *Id.* Granger filed suit against Chong, and a proposed settlement was reached whereby Chong would pay Granger $90,000 in exchange for a full release of all claims. *Id.* When informed of the settlement proposal, and after it had completed an assets-check evaluation of Chong, GEICO informed Granger that it could not consent to any BI settlement that fully released Chong from GEICO's subrogation interests. *Id.* Granger notified GEICO that Chong would withdraw her settlement offer if anything less than a full release was provided, and Granger requested that GEICO immediately pay her $90,000, an amount equal to Chong's settlement offer. *Id.* at 162–63, 140 P.3d at 395–96.

Granger then filed suit for declaratory judgment against GEICO, arguing in part that: (1) "GEICO cannot refuse to consent to the settlement of the underlying action and thereby compel Granger to either pursue said underlying action to judgment or forfeit her rights to UIM coverage"; and (2) "GEICO must either consent to the settlement or assume Granger's position in the underlying action by paying her the amount she would have received from [Chong.]" *Id.* at 163, 140 P.3d at 396 (some brackets and ellipses omitted). The circuit court granted summary judgment in favor of GEICO. *Id.* at 164, 140 P.3d at 397.

On appeal, the supreme court upheld GEICO's right, after investigation, to refuse to consent to the settlement to protect its subrogation rights. *Id.* at 165–66, 140 P.3d at 398–99. The supreme court also held, however, that GEICO, having withheld its consent to the proposed settlement, "must put itself in the position of Granger's subrogee by paying her $90,000.00, the amount of the Chong's offer." *Id.* at 166, 140 P.3d at 399.

The supreme court reasoned that "after the UIM insurer has a reasonable opportunity to consider the implications of a pending settlement, it must either allow the settlement to proceed or tender to its insured a payment equal to the tortfeasors' settlement offer (up to the limits of the insured's UIM coverage)." *Id.* Thus, "GEICO should have been left to the task of estimating whether (1) 'buying' itself the right to sue for $90,000.00 and then incurring the time and expense of litigation will net a more favorable outcome than (2) permitting the compromise and then reimbursing Granger for her compensable damages that exceed $100,000.00[.]" *Id.* at 168, 140 P.3d at 401.

This is because, the court continued, although GEICO may in good faith "prolong the lawsuit against [Chong] for its own benefit[,]" *id.,* it cannot both withhold consent to protect its subrogation rights *and* decline to pay an amount equal to the settlement offer because

> we cannot allow GEICO to *conscript Granger as its 'vicarious plaintiff'* for the pur-

pose of recovering, at substantial cost, funds that she *already paid GEICO to bear the risk of providing in the event of an underinsured injury. See Pitts v. Trust of Knueppel*, 282 Wis.2d 550, 698 N.W.2d 761, 773 (2005) ("[T]he transfer of risk is the only reason that insureds pay premiums to insurers."); *Vogt [v. Schroeder,* 129 Wis.2d 3], 383 N.W.2d [876] at 882 [ (Wis.1986) ].

*Id.* (footnote omitted; emphases added). *See also Guajardo,* 118 Hawai'i at 205–06, 187 P.3d at 589–90 (citing *Granger,* and criticizing the auto insurer's asserted interpretation of its policy that would have required the insureds to pursue the tortfeasor to judgment in order to obtain their UIM benefits because this would "plainly put [the insureds] 'between the proverbial rock and a hard place' ").

Similarly here, upholding the validity of Liberty Mutual's excess "other insurance" clause effectively shifts the burden and cost of recovery and litigation to Liberty Mutual's own insured, Labrador, whose parents had already paid a premium for UM and UIM coverage. Liberty Mutual has used its excess "other insurance" clause to refuse to compensate its own injured-insured for more than a decade and has thereby "conscript[ed Labrador] as its 'vicarious plaintiff' for the purpose of recovering, at substantial cost, funds that [her parents] already paid [Liberty Mutual] to bear the risk of providing[,]" *Granger,* 111 Hawai'i at 168, 140 P.3d at 401, "in contravention of one of the legislature's stated goals … i.e., 'providing speedy and adequate protection to persons injured in motor vehicle accidents *at the least possible cost.*'" *Guajardo,* 118 Hawai'i at 206, 187 P.3d at 590 (quoting *Taylor,* 90 Hawai'i at 313 n. 10, 978 P.2d at 751 n. 10).

6.

The majority's decision to uphold Liberty Mutual's excess "other insurance" clause is also problematic from a public-policy standpoint.

The decision will no doubt promote piecemeal redrafting of "other insurance" clauses as insurers seek to reverse the results of this case or make their policies excess to other available policies. For example, since the Hawai'i Supreme Court has held that UM coverage attaches to the named insured's person and not the insured's vehicle, what is to prevent PEMCO and H/S from amending their policies to provide that where multiple UM policies are available, the UM policy covering the occupant of a vehicle involved in a motor vehicle accident shall be primary to any UM policy covering the specific vehicle involved in the accident. The proliferation of competing "other insurance" clauses that will surely become part of automobile insurance policies will undoubtedly lead to more litigation regarding the interpretation and application of these clauses. The uncertainty these competing clauses engender will invariably lead to higher premiums for Hawaii's citizens. *See discussion:* Robertson, 20 S. Ill. U. L.J. at 449–50.

Moreover, as this case amply demonstrates,[3] upholding the validity of excess "other insurance" clauses will only serve to delay

settlement or trial in cases where the insured and the injured third-party claimants must await litigation between the insurers, each of whom claims that its insurance is excess and the other's is primary. As insurers attempt to avoid the costs of defense by being declared merely excess insurers, there is a great incentive to litigate the "other insurance" issues in a declaratory judgment action while the underlying claim is stayed pending resolution of the issue of which insurer provides primary coverage. Indeed, a Texas insurance administrator has said that this approach has "the insured sitting there in a cross-fire, being ping-ponged back and forth between two insurance companies…." The costs of caring for injured persons, pending decision on which of several insurers must pay for primary coverage which is conceded to be due from someone, is an un-

---

3. Labrador was injured in 1994 when she had just entered her teen years. It is now almost fifteen years later, and because of the multiple disputes among the insurance carriers, she still has not been fully compensated for her undisputed injuries.

necessary and cruel burden to impose on injured persons, their families, and communities.

*Id.* at 450 (footnotes omitted).

I would:

(1) Reverse that part of the "Order Denying [Labrador's] Motion for Reconsideration; Motion re: Equitable Estoppel; Motion to Set Case for Trial, Filed June 27, 2002" filed on March 17, 2003, which denied Labrador's motion for reconsideration of the circuit court's ruling that the "other insurance" provision in Liberty Mutual's policy "was not unenforceable as a matter of public policy" but affirm the order in all other respects;

(2) Reverse that part of the "Order Denying [Labrador's] Motion for Partial Summary Judgment Against [Liberty Mutual], Filed 02/27/02, and Granting in Part and Denying in Part [Liberty Mutual's] Cross–Motion for Summary Judgment, Filed 03/08/02" filed on March 17, 2003, which determined that Liberty Mutual's policy was "excess" to the H/S policy but, in all other respects, affirm the order; and

(3) Vacate the Final Judgment filed on July 21, 2005 to the extent that it entered judgment partially in favor of Liberty Mutual based on the foregoing orders.